115 N.J. Super. 380 (1971)
279 A.2d 889
IN THE MATTER OF SISTER MARGARET MURTHA, CHARGED WITH CONTEMPT OF COURT.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 1971.
Decided July 6, 1971.
*381 Before Judges GOLDMANN, HALPERN and FRITZ.
Mr. Robert L. Podvey argued the cause for appellant Sister Margaret Murtha (Messrs. Podvey, Sachs & Kaltenbacher, attorneys).
Mr. Edwin H. Stern, First Assistant Prosecutor, argued the cause for respondent State of New Jersey (Mr. Geoffrey Gaulkin, Hudson County Prosecutor, attorney).
The opinion of the court was delivered by GOLDMANN, P.J.A.D.
Sister Margaret Murtha appeals from a Law Division order holding her in contempt for violation of an order directing that she testify before a special Hudson County grand jury, and confining her to the county jail until she had purged herself by answering the questions posed. The trial judge having denied bail, we released Sister Margaret in the custody of her attorneys and scheduled the appeal for early argument.
On March 4, 1971 Sister Margaret appeared pursuant to subpoena before the special grand jury investigating an alleged homicide that had taken place about midnight of February 26/27, 1970. After giving her name, and her address as St. Boniface Convent, Jersey City, she affirmatively answered a question as to whether she was at the convent on February 27, 1970 when Sister Francesca awakened her at 1 A.M. to speak to a Louis Cevetello. Having stated that she had a conversation with him at that time, she was shown a statement signed but not sworn to by her at police headquarters at 3:05 of the morning in question. She admitted she had read the statement before signing it, but *382 when asked if it reflected, in substance, what she had told the police prior to signing, she refused to answer, claiming the priest-penitent privilege.
Sister Margaret was then asked a series of questions which she refused to answer on the basis of the same privilege: whether, after meeting with Cevetello, she had occasion to leave the convent with him and Sister Francesca; whether they drove to the area of Cole Street and 7th and 8th Streets, Jersey City; whether she had occasion to see a man lying there with his stomach moving up and down; whether the three of them then drove to the Second Precinct police station; whether, when Cevetello met her at the convent, he told her he wanted to go to the police station and tell what had happened; whether he at that time told her he had been drinking with a man known as "Happy" and had subsequently hit him, and that he appeared to be badly hurt and was lying in Cole Street between 7th and 8th Streets; whether she had gone to the Second Precinct at 1:30 A.M. and told Desk Lieutenant Byrne that Cevetello had been in a fight with a man and had come to her at the convent, that the man was still lying in the street and she did not know if he was alive, but that his stomach was moving up and down.
Upon her refusal to answer before the grand jury, Sister Margaret was brought before Assignment Judge Larner for a hearing on her claim of privilege. The grand jury proceedings, outlined above, were read into the record. Sister Margaret was permitted to testify in order to establish the facts upon which she based her claim of the priest-penitent privilege. She said she was a member of the Dominican Sisters of Caldwell, primarily a teaching order. Her four-year training period to become a nun included instruction in the religious life as well as in secular courses to prepare her for teaching. Cevetello, a Catholic youth of 12 or 13 when she first met him in 1966, attended her social studies classes. From the beginning he would see her at the convent and at school to discuss family, social and moral problems, school problems and, on occasion, religious problems. Over *383 a period of five years he talked with her at least once a month, and sometimes as frequently as once a week.
On cross-examination Sister Margaret, in answer to the trial judge's inquiry, admitted that she did not conduct any type of religious services in the school, nor did she "carry on any of the priest[ly] religious functions, such as confession or anything else which is normally done by a priest." Nonetheless, she insisted that her role as teacher was secondary to her religious life: she viewed herself as "primarily a religious person."
After considering the testimony, the arguments of counsel and the briefs submitted, Judge Larner found that Sister Margaret could not assert the priest-penitent privilege under N.J.S.A. 2A:84A-23 (Evidence Rule 29). Privileges, he said, must be strictly construed, citing State v. Briley, 53 N.J. 498 (1969). He found that Sister Margaret was basically a teacher; her contacts wtih Cevetello involved not only the classroom teaching, but "the extension of the true functions of a good teacher, namely, acting by way of an advisor to the pupil, not only in connection with the formal subjects being taught but in connection with all problems that the boy may have had * * *." The fact that Sister Margaret had a religious training and background, and that she taught in a religious school, did not in the judge's opinion change her status with respect to her relationship with young Cevetello. Further, she did not perform the normal functions of a priest, did not conduct religious services, and had no powers or functions insofar as the Catholic Church was concerned. Judge Larner also found that what Cevetello told Sister Margaret on the night in question was not communicated to her in her professional character.
An order directing Sister Margaret to answer the questions put to her before the special grand jury was signed on March 9, 1971. This court, as well as the Supreme Court, denied her applications for leave to appeal. It appears that her attorney and the prosecution then agreed it would be *384 satisfactory if Sister Margaret testified before the grand jury as to her observations and actions on the morning in question and to the fact that there had been a conversation between her and Cevetello; and further, that she would give this same testimony if called at the time of trial. However, according to her attorney, when she presented herself at the courthouse on May 6, 1971 to testify before the grand jury, the prosecutor asked her to promise she would testify at the trial as to the conversation she had with Cevetello the morning of February 27 if he took the stand and lied. She rejected the proposal and was then brought before the grand jury and asked the same questions as had been posed on her first appearance. After she again refused to answer the questions, she was taken before Judge Larner and her grand jury testimony read. The judge ordered her to answer, and when she refused to do so on the basis of the priest-penitent privilege, he found her in violation of the order of March 9 and immediately committed her to the county jail. The contempt order here under appeal followed.
It will be seen that the only asserted ground for Sister Margaret's refusal to answer the questions asked of her before the special grand jury was her claim to the priest-penitent privilege. That claim was re-asserted in her applications for leave to appeal as well as in her application to be released from custody after entry of the contempt order. At oral argument of the appeal, however, a new contention was advanced. What Cevetello had told her, it is now said, was a confidential communication, and the State was prohibited from compelling its disclosure  this under the free exercise of religion provision of the First Amendment to the United States Constitution. It was conceded at the argument that this position was one of individual conscience, and was not a matter of church discipline or doctrine.
The priest-penitent privilege was not recognized as a rule at common law, either in England (certainly after the Restoration, 1660) or in the United States. 8 Wigmore on Evidence (3d ed. 1961), § 2394 at 869. New Jersey did *385 not recognize it prior to 1947. State v. Morehous, 97 N.J.L. 285, 295 (E. & A. 1922). L. 1947, c. 324 (N.J.S.A. 2A:81-9) for the first time provided that
A clergyman, or other minister of any religion shall not be allowed or compelled to disclose in any court, or to any public officer, a confession made to him in his professional character, or as a spiritual advisor, or as a spiritual advisor in the course of discipline enjoined by the rules or practice of the religious body to which he belongs or of the religion which he professes.
The 1947 act was repealed by L. 1960, c. 52, § 49 and was supplanted by N.J.S.A. 2A:84A-23 (Evidence Rule 29), which reads:
Subject to Rule 37, a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes.
Evidence Rule 37 (N.J.S.A. 2A:84A-29) provides that "a person waives his right or privilege to refuse to disclose * * * a specified matter if he * * * without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter * * *."
Evidence Rule 29 obviously broadened the privilege to include not only a clergyman or minister, but any "other person or practitioner authorized to perform similar functions" of any religion. Moreover, the rule now prohibits not only the disclosure of a confession, but also any "confidential communication" made to any such designated person in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes.
State v. Briley, above, which dealt with the husband-wife privilege in a criminal action (Evidence Rule 23(2), N.J.S.A. 2A:84-17), set out the policy which should control *386 whenever a claim of privilege against testifying is made. Justice Francis pointed to Evidence Rule 7 as declaring the basic policy of our law  that except as otherwise provided in the Evidence Rules or by statute, every person is qualified and compellable to be a witness and to give relevant and competent evidence at trial. The privileges granted under Evidence Rules 23 to 32, 34, and 36 to 40 (N.J.S.A. 2A:84A-17 to 32) to persons who refuse to testify or to prevent another from testifying were exceptions to that policy. Justice Francis added:
* * * Since rigid adherence to the letter of the privileges promotes the suppression of truth, they should be construed and applied in sensible accommodation to the aim of a just result. In view of the obvious policy of the law to enlarge the domain of competency of witnesses and to adapt rules of evidence to the successful development of the truth, competency should be regarded as the rule and incompetency as the exception. * * * It follows therefore that when a greater public interest is served by recognizing the competency of one spouse to testify against the other and no violence is done to the privilege as expressed in a statutory or judicial rule of evidence, the testimony should be received. [53 N.J. at 506; citations omitted]
Applying what was said in Briley to Sister Margaret's claim of the priest-penitent privilege, attention must at once be focused on the clause, "a clergyman, minister or other person or practitioner authorized to perform similar functions." Sister Margaret did not, and obviously could not, show that she was a person or practitioner authorized to perform functions similar to those performed by a clergyman or minister  more specifically, by a priest. She was a religious (religieuse), a dedicated member of a teaching order of nuns, but she admittedly did not conduct any type of religious services involving pupils in the school, nor did she carry on any of the religious functions of a priest, such as hearing confessions or giving absolution. Asked to explain, if she could, what religious aspect she attached to her relationship with individuals such as Cevetello, as opposed to a social or an educational aspect, her answer was: "Very *387 frequently some problem, some moral problem as I stated before, or some problem even with some function or law of the church where they would be confused"  sic. When Judge Larner asked her whether this was not part and parcel of the educational process involved in teaching, even if what she did took place after school hours, she answered that she never thought of it as solely an educational problem; "I saw other aspects of it." To clarify that answer the judge asked, "When you talk about other aspects, are you talking about the overall general purpose that you feel you have in life; in dealing with children, in handling the whole child, whether it be his formal education, his religious problem, his social problems or whatever may arise; isn't that it?" Sister Margaret's answer was, "Yes."
Counsel has been unable to find anything in Catholic doctrine or practice that would give Sister Margaret the right to claim the priest-penitent privilege. In our own research we have found no authority, textual or decisional, to support the contention now advanced that a nun qualifies for the privilege. In this connection, we were informed by counsel that Sister Margaret's superiors urged her to testify; neither priest nor mother superior perceived any barrier to her doing so. We note from the record that Sister Francesca, who at one point also claimed the privilege, eventually agreed to testify to the fact of there having been a conversation between Cevetello and Sister Margaret and as to what she (Sister Francesca) saw and did thereafter.
Although we dispose of Sister Margaret's claim of privilege on the basis of our reading of Evidence Rule 29, one may well question her right to the claim in light of Evidence Rule 37, relating to waiver of privilege by previous disclosure. She did not hesitate to go directly to the police station after viewing the body Cevetello pointed out to her, and there sign a statement as to what he had told her at the convent and what she saw and did thereafter. Her posture then was not that of a person standing in the relation of a priest hearing Cevetello's confession or confidential communication. *388 He had, quite simply, come to her for support and help in a time of great trouble, ready to go to the police and tell what happened. What Sister Margaret learned, Sister Francesca also learned, and the two of them accompanied Cevetello to Cole Street, and then to the police station. Any claim of confidentiality and privilege evaporates in such a factual setting.
We turn to the contention that the State is prohibited from compelling the disclosure of Cevetello's alleged "confidential communication" by reason of the First Amendment to the United States Constitution: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *," made applicable to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1948); Engel v. Vitale, 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).
Counsel quotes at length from the constitution of Sister Margaret's order as laying down the guidelines for a Dominican sister's life. A thoughtful reading of the text fails to show that the path Sister Margaret would pursue in this case is dictated by the precepts of her teaching order, whose members "accept as our special commitment the pursuit and dissemination of truth." The Caldwell Dominicans, declares the order's constitution, "accept as our specific vocation the apostolate of education, by which we understand the communication of truth, which has ever been the Dominican ideal. Our concept of the educational apostolate embraces the communication of truth at all levels, from pre-school training through adult formation: It includes likewise both the formal and informal channels of education." In light of the precepts embraced by Sister Margaret and her Dominican sisters, we find without substance her assertion that it was in performance of her obligations that she met with Cevetello and that what she heard, saw and did represented a constitutionally guaranteed right to the free exercise of her religion.
*389 As noted, at oral argument the claim of free exercise of religion was transmuted into a claim of free exercise of conscience  a change of direction quite understandable in light of an inability to demonstrate anything in the Catholic religion prohibiting disclosure. In support of the argument that Sister Margaret was in conscience committed to keep confidential what Cevetello told her, counsel refers us to the treatment of this issue by the United States Supreme Court with regard to persons claiming conscientious objector status under the Selective Service Act. Section 6(j) of the act (50 U.S.C.A., § 456 (j)) exempts from combatant training and service in the armed forces any person who "by reason of religious training and belief, is conscientiously opposed to participation in war in any form." That section goes on to provide that "religious training and belief" does not include "essentially political, sociological or philosophical views, or a merely personal moral code."
The most recent case is Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), in which the Supreme Court accepted the reasoning of the Second Circuit in United States v. Kauten, 133 F.2d 703 (1943), that the proper focus of the test for military exemption is on the "conscientious" quality of the belief, and not its religious or nonreligious quality, and therefore the class of exempted persons must be wide enough to include those nonreligious believers whose opposition is based upon the "compelling voice of conscience." Cf. In re Weitzman, 426 F.2d 439 (8 Cir.1970) (exemption, under section 337(a) of the Immigration and Nationality Act of 1952, 8 U.S.C.A., § 1448(a), from swearing to an oath to bear arms in the armed forces for any person "who shows by clear and convincing evidence" that he is opposed to bearing arms "by reason of religious training and belief").
The relationship of conscience to religion is a subject that lends itself to almost limitless treatment, whether one's approach be theological, philosophical or, as here, constitutional. This vexing question has received increasing attention *390 of late, particularly with respect to the claim of conscientious objector status in the military draft. The most recent treatment appears in 38 U. of Chi. L. Rev. 583 (1971), "The Legal Relationship of Conscience to Religion: Refusals to Bear Arms," where many of the latest writings and authorities are referred to in the footnotes. If Sister Margaret's cause is to draw any strength from the Kauten-Welsh-Weitzman holding, it must be that she has clearly and convincingly demonstrated that a compelling voice of conscience has sealed her lips. This she has not done. The most that can be said for her testimony is that it reflects a personally held moral code allegedly rooted in religion.
If Sister Margaret's present conviction that she should not answer to the grand jury is a sincere one, one cannot but help wonder where that conviction, where that compelling voice of conscience, was when she hastened to the police station immediately after she had gone with Sister Francesca and Cevetello to view what he had to show her on Cole Street. Then, after telling the police exactly what had been said and what had happened, she signed a statement in which she declared that it was "true and voluntary."
This case calls for a balancing of interests  that of the State in enforcing the power of the grand jury to inquire into the commission of a crime, and that of Sister Margaret who claims that she responds to a call of conscience. In the particular circumstances of this case the latter must give way to the former. Cf. People v. Woodruff, 50 Misc.2d 430, 270 N.Y.S. 2d 838 (Sup. Ct. 1966), aff'd 26 A.D.2d 236, 272 N.Y.S.2d 786 (App. Div. 1966), appl. dism. on cond. 20 N.Y.2d 879, 285 N.Y.S.2d 622, 232 N.E.2d 652 (Ct. App. 1967), aff'd 21 N.Y. 2d 848, 288 N.Y.S.2d 1004, 236 N.E.2d 159 (Ct. App. 1968); In re Williams, 269 N.C. 68, 152 S.E.2d 317 (Sup. Ct. 1967), cert. den. 388 U.S. 918, 87 S.Ct. 2137, 18 L.Ed.2d 1362 (1967).
Counsel has attempted to analogize this case to Caldwell v. United States, 434 F.2d 1081 (9 Cir.1970), cert. grtd., 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971), *391 which dealt with the First Amendment's guarantee of freedom of the press in the setting of a reporter's refusal to disclose the confidential sources of his information. It is claimed that to compel Sister Margaret to testify before the grand jury would have the same "chilling effect" on her right to a free exercise of her religion as would have been visited upon the right to freedom of the press in Caldwell were the reporter there compelled to reveal his sources. Counsel draws a long legal bow in so arguing. No one is denying Sister Margaret her right to a free exercise of her religion. We perceive no equation, either factual or legal, between Caldwell and the present case.
The order under review is affirmed.