270 N.J. Super. 169 (1993)
636 A.2d 1054
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN E. LIST, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 27, 1993.
Decided June 21, 1993.
*171 Before Judges PRESSLER, R.S. COHEN and KESTIN.
J. Michael Blake, Assistant Deputy Public Defender and Joan D. Van Pelt, Deputy Public Defender argued the cause for appellant (Zulima V. Farber, Public Defender, attorney; Mr. Blake and Ms. Van Pelt, of counsel and on the brief).
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Ms. Foddai, of counsel and on the brief).
PER CURIAM.
Defendant was charged with and convicted of five counts of first degree murder. He was sentenced to five consecutive life terms. The following issues are raised on appeal:
POINT I THE TRIAL COURT ERRED IN DENYING THE SUPPRESSION MOTION BECAUSE THE EXCEPTIONS IT RELIED UPON [INEVITABLE DISCOVERY, EMERGENCY AID ON EXIGENT CIRCUMSTANCES, ABANDONMENT] DID NOT EXCUSE OR JUSTIFY THE WARRANTLESS ENTRY AND SEARCHES OF THE RESIDENCE AND ITS CONTENTS THAT OCCURRED. THE SEARCHES AT ISSUE VIOLATED BOTH THE UNITED STATES AND STATE CONSTITUTIONS.
POINT II TRIAL COUNSEL'S FAILURE TO MOVE TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH WARRANTS WHICH WERE BASED UPON EVIDENCE SEIZED IN THE WARRANTLESS SEARCH OF THE LIST RESIDENCE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.
POINT III THE TRIAL COURT'S DECISION THAT THE LETTER FROM DEFENDANT TO HIS MINISTER WAS ADMISSIBLE VIOLATED NOT ONLY EVIDENCE RULE 29 BUT ALSO THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PARA. 3 AND 4 OF THE CONSTITUTION OF THE STATE OF NEW JERSEY.
POINT IV THE SEIZURE BY THE POLICE OF THE DEFENDANT'S LETTER TO HIS PASTOR VIOLATED THE DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION AS PROTECTED BY THE FIFTH AMENDMENT AND BY THE NEW JERSEY COMMON LAW PRIVILEGE AGAINST SELF-INCRIMINATION. (Not Raised Below)
POINT V THE VENUE AND MANNER OF JURY SELECTION DENIED THE DEFENDANT HIS CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL.
A. The Court Erred in Denying Defendant's Motion for a Change of Venue.

*172 B. The Court's Failure to Excuse Jurors with Preconceived Opinions Denied the Defendant His Constitutional Right to an Impartial Jury.
C. The Trial Court Should Have Increased the Number of Preemptory Challenges Afforded to Defendant.
POINT VI DEFENDANT WAS DENIED A FAIR TRIAL BY THE COURT'S ERRONEOUS INSTRUCTION TO THE JURY AS TO MALICE AND MENTAL DEFECT, BY THE COURT'S LIMITATION OF THE TESTIMONY SOUGHT TO BE PRESENTED BY THE DEFENSE AS TO MALICE AND MENTAL DEFECT, AND BY THE COURTS REFUSAL TO CHARGE MANSLAUGHTER.
POINT VII DEFENDANTS CONVICTION SHOULD BE REVERSED BECAUSE HE WAS DENIED DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND THE STATE CONSTITUTION DUE TO PROSECUTORIAL MISCONDUCT IN A) APPEALING TO RELIGIOUS PREJUDICE, B) DENIGRATING THE DEFENSE, C) INTERJECTING SYMPATHY FOR THE VICTIM AND D) REFERENCE TO THE DEFENDANT BY THE USE OF AN INVIDIOUS EPITHET.
POINT VIII THE IMPOSITION OF FIVE CONSECUTIVE LIFE SENTENCES WAS CLEARLY EXCESSIVE.
At about 9 a.m. on November 9, 1971, after his three children had gone to school, defendant killed his wife by shooting her in the head from behind while she was sitting at the breakfast table. He then proceeded to the third floor of the home where his mother lived in separate quarters. Defendant and his mother walked together to the third floor kitchen. Defendant then killed his mother by shooting her in the head from behind. He could not move the body and left it where it lay. He returned to the first floor, dragged his wife's body into the ballroom, "cleaned up the mess," and ate lunch.
After lunch, defendant went to the bank to redeem about $2,000 in savings bonds which were in his name and his mother's, to gain access to his safety deposit box, and to cash two checks. He then placed a stop order on his mail and his mother's at the post office.
Later in the afternoon, defendant picked up his oldest child, Patricia, a high school student, took her home and killed her with a shot to the left side of the face. Defendant then picked up his son Frederick from junior high school and, upon arriving home, killed Frederick with a shot to the head. Still later, when the *173 remaining child, John, also a junior high school student, arrived home he was killed by defendant with "at least ten" gun and rifle shots.
Defendant then "cleaned up" and moved the children's bodies into the ballroom. By telephone and through notes, defendant stopped milk and newspaper deliveries and made arrangements for the children's absences from school and other activities, as well as his own absence from work, until after Thanksgiving. He then wrote letters to several relatives and a long letter to his pastor, Rev. Rehwinkel, in order "to tell somebody about what had occurred." Defendant also composed some other notes with instructions concerning funeral arrangements for his family members. He then ate supper and went to bed.
Early the next day, defendant packed some of his possessions and shipped them by railway express. He drove to Kennedy Airport and abandoned his car there. He then went to New York City by public transportation and commenced a circuitous trip ending in Denver, where he obtained a new Social Security card in the name of Robert Clark. He took a job as a cook and "kept a low profile life," changing his appearance from time to time and avoiding any trouble. He "made sure not even to get a parking ticket," and avoided situations such as passport applications which, he believed, required fingerprinting.
On December 7, 1971, exactly four weeks after the killings, the police were summoned to the house by concerned friends. After consulting with these friends and some neighbors who expressed particular concern for the elderly Mrs. List, defendant's mother, the police and two of the friends entered the house through the only unlocked window they found, on the side porch. The bodies were discovered, four in the ballroom and one on the third floor.
Shortly thereafter, the police officer in charge of the investigation arrived. He and other police officers assisting him read a note which they found on top of a desk in the study. The note was addressed "To the finder" and signed "J. List." It contained a request that the authorities be contacted. The note also said *174 that the key to the desk was in an envelope addressed to defendant and that the keys to the file cabinets were in the desk. Another note on the front of a locked desk drawer was labelled "guns and ammo." A police officer pried the drawer open and found two firearms and some assorted ammunition.
Notes were also attached to the two file cabinets. One attached to the middle drawer of the smaller cabinet contained the legend "For Pastor Rehwinkel, ... [defendant's employer] and administrator." The note on the larger filing cabinet contained the name of defendant's employer.
Inside the smaller file cabinet the police found an unsealed file folder "For Pastor Rehwinkel of the Redeemer Lutheran Church." The folder contained a five-page letter to Rev. Rehwinkel dated November 9, 1971, in which defendant confessed to killing the members of his family. The letter was not in a separate envelope. The folder also contained photocopied stock certificates, a check-book and an interest computation slip. The police also found a letter in the top drawer of one of the file cabinets which was addressed: "To the administrator" and a note addressed "Hello Burt" (defendant's employer).
Some 17 1/2 years later, defendant was identified after the killings were depicted in a network television broadcast. He was arrested at his home in Virginia.
On a motion to suppress the evidence found during the warrantless search of the house, the trial judge held the evidence to be admissible, inter alia, on abandonment and inevitable discovery grounds. State v. List, 270 N.J. Super. 252, 636 A.2d 1097 (Law Div. 1990). We are in substantial agreement with the reasoning of the trial judge in this regard. See State v. Farinich, 179 N.J. Super. 1, 6, 430 A.2d 233 (App.Div. 1981), aff'd o.b., 89 N.J. 378, 446 A.2d 120 (1982); State v. Sugar (II), 100 N.J. 214, 235-40, 495 A.2d 90 (1985). See also 1 La Fave, Search and Seizure § 2.6(b) (2d ed. 1987).
Defendant's invocation of the clergy-communicant (priest-penitant) privilege is insupportable. It is clear both from *175 the very terms of Evid R. 29 (N.J.S.A. 2A:84A-23) and the history of the privilege that it protects confidential communications only. Cf. Note, Developments In The Law  Privileged Communications, 98 Harv.L.Rev. 1450, 1555-1563 (1985). The letter to Rev. Rehwinkel, left for anyone to find and read, cannot be considered to have been made with a reasonable expectation of confidentiality.
Defendant contends that he was denied due process when the trial judge declined to excuse certain jurors for cause, requiring defendant to exercise peremptory challenges. In all instances the jurors had indicated either in their pre-voir dire questionnaires or on voir dire itself that, based upon information gained from news reports when the victims were discovered, from time to time in the interim, or more recently when defendant was apprehended, they had formed opinions that defendant was guilty. In careful questioning, the judge elicited an expression of understanding from each of these jurors that guilt was to be determined on the evidence alone and that predispositions were to be put aside. In each instance the juror being interrogated indicated his or her willingness and ability to do so and to be governed by the presumption of innocence.
The manner in which these aspects of voir dire was conducted comported fully with the requirements of State v. Williams (II), 113 N.J. 393, 428-436, 550 A.2d 1172 (1988). Each such instance of denial of defendant's application to disqualify a juror for cause was based on the trial judge's reasoned evaluation that the juror could function free of bias or predisposition. Determinations of this type are within the sound discretion of the trial judge. State v. Carroll, 256 N.J. Super. 575, 607 A.2d 1003 (App.Div.) certif. denied, 130 N.J. 18, 611 A.2d 656 (1992). We discern no abuse of discretion here.
Defendant also argues that the imposition of five consecutive life sentences violated the guidelines established in State v. Yarbough, 100 N.J. 627, 643-44, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986). We are unpersuaded that the trial judge erred in identifying, evaluating, *176 or applying the aggravating and mitigating factors. Defendant emphasizes that criterion of Yarbough which provides
there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest term .. . that could be imposed for the two most serious offenses.
We regard this case as falling within the permitted exception to the rule. Id. at 647, 498 A.2d 1239. The killings, although related in defendant's mind, were predominantly independent of each other. Each was committed at a different time on successive victims in separate circumstances. State v. Louis, 117 N.J. 250, 566 A.2d 511 (1989).
We regard the issues raised in Points II, IV, V A and C, VI and VII to be clearly without merit. R. 2:11-3(e)(2).
Affirmed.