751 A.2d 620 (2000)
331 N.J. Super. 236
STATE of New Jersey, Plaintiff-Appellant,
v.
David CARY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 2000.
Decided June 1, 2000.
*621 Hilary L. Brunell, Executive Assistant Prosecutor, for plaintiff-appellant (Donald C. Campolo, Acting Essex County Prosecutor, attorney; Ms. Brunell, of counsel and on the brief).
Yvonne Smith Segars, First Assistant Deputy Public Defender, for defendant-respondent (Michael J. Marucci, Public Defender, attorney; Ms. Segars, on the brief).
Before Judges KING, LEFELT and LINTNER.
The opinion of the court was delivered by LEFELT, J.S.C. (temporarily assigned).
The issue presented in this interlocutory appeal is whether the cleric-penitent privilege, N.J.S.A. 2A:84A-23; N.J.R.E. 511, applies when a defendant confesses to a Baptist deacon who is also a New Jersey State Trooper. We conclude that the privilege does not apply to the communication in this case between the defendant and the deacon-trooper, and we reverse the motion judge's suppression of the statement.
We recount the pertinent facts. Allegedly, on February 5 or 6, 1999, an altercation occurred between defendant David Cary and at least one other individual near a Country Fried Chicken restaurant in Newark. After this altercation, the State claimed that defendant returned to the Country Fried Chicken and fired several gun shots into the store, striking two bystanders, Andre Dean and Salvatore Johnson. Johnson survived, but Dean died from his injuries.
*622 On Sunday, February 7, 1999, Cary visited the Second Baptist Church in Belleville to speak with his pastor, Lucious Williams. After attending the morning service, Cary met privately with Pastor Williams, apparently to seek spiritual guidance regarding the altercation and how he should proceed. After meeting with the pastor, Cary indicated that he wanted to surrender to the police. Therefore, Pastor Williams summoned a recently ordained deacon, John Perry, because Perry was also a state trooper and the pastor needed assistance in "what should we do about trying to help [Cary] and what [Cary] asked us to help him to do."
Before meeting with Cary, Perry met with Pastor Williams. During this conversation, Perry learned that Cary had come "to turn himself in, because he got in trouble with the law." Perry and Williams discussed some "minor details" of the incident during this brief conversation.
Perry and Pastor Williams then met with Cary in the pastor's study. Perry testified that he "introduced [himself] as a deacon in the church and I also mentioned that I was a state trooper." During this meeting, Cary related certain events that had occurred in Newark, and "at a certain point in [Cary's] statement to [Perry], [Perry] reminded [Cary] of his right to remain silent." After receiving this warning, Perry testified that Cary continued to talk about the incident, but Perry never interrogated him. At some point in the meeting all three men prayed together.
Additionally, during the meeting, Perry testified that he searched Cary by having him stand against the wall and spread his arms and legs in a traditional search posture. When Cary finished his statement, Perry called the Newark and Belleville police departments. Once Perry had called these authorities, he testified that Cary was no longer free to leave.
The Newark police arrived and transported Cary to the Newark Police Department. Shortly thereafter, both Pastor Williams and Perry arrived at the Newark Police Department. Cary refused to speak to the police following his arrest, so Detective Michael DeMaio of the Newark Police Department asked Perry to give a statement regarding his knowledge of the incident that led to the shooting of Andre Dean.
In his police statement, Perry's version of the meeting with Cary varied slightly from his suppression hearing testimony. For instance, rather than stating "at a certain point" he informed Cary of his right to remain silent, Perry stated that after Cary informed Perry that he wanted to surrender to the police, Perry "advised [Cary] of his rights per Miranda and he waived [them] ... and expressed to me in little detail about a[n] incident that he was involved in on February 5, 1999." Moreover, in his suppression hearing testimony, Perry testified that he told defendant he had the right to remain silent and "that was pretty much it[,]" whereas his statement indicated that he advised defendant of his rights "per Miranda."
Nevertheless, when the Newark police asked Perry what defendant had said after Perry advised him of his Miranda rights, Perry initially responded, "[a]t this point I don't want to divulge that information. Because of my deacon responsibilities and to my congregation but if so ordered or compelled to by law then I [will] tell what has to be told." After speaking with a Newark police official, an assistant prosecutor and a superior officer at the state trooper barracks, Perry decided to complete his statement. Perry then revealed that Cary admitted shooting a gun during an altercation and that Cary believed he had killed someone. This statement is the focus of Cary's appeal.
The motion judge concluded that the cleric-penitent privilege applied to Cary's statement to Perry because Perry was a cleric pursuant to N.J.S.A. 2A:84A-23 and "as such is prohibited from waiving the privilege without defendant's consent." The judge noted that a "deacon of the *623 Baptist faith is ordained" and cited Robert E. Naylor, The Baptist Deacon (1955), a manual or handbook for deacons, for the proposition that a deacon's responsibilities "range from handling business affairs of the church and visiting the sick, to conducting services in the absence of the pastor." Thus, the judge concluded that because Perry was a cleric, defendant's statement to Perry was inadmissible and must be suppressed.

I.
Common law did not recognize the cleric-penitent privilege and it did not exist in New Jersey until statutorily authorized in 1947. State v. Szemple, 135 N.J. 406, 424, 640 A.2d 817 (1994); State v. Morehous, 97 N.J.L. 285, 295, 117 A. 296 (E. & A.1922). At its 1947 inception, the privilege only applied to confessions to clergymen and ministers. N.J.S.A. 2:97-5.1; N.J.S.A. 2A:81-9. The Evidence Act of 1960 expanded the privilege's coverage by recognizing both confessions and confidential communications made to a clergyman in his or her professional character or as a spiritual advisor. In re Murtha, 115 N.J.Super. 380, 385, 279 A.2d 889 (App. Div.), certif. denied, 59 N.J. 239, 281 A.2d 278 (1971). A 1981 amendment further expanded the privilege, and required clergymen to protect the communication itself as well as the mere fact that a confidential relationship existed. Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 511 (2000).
In Szemple, supra, 135 N.J. at 422-23, 640 A.2d 817, the Supreme Court held that N.J.S.A. 2A:84A-23, as it then existed, conferred "a testimonial privilege only on clergypersons[,]" and the penitent had no power to preclude disclosure. In response to Szemple`s narrow interpretation, the Legislature immediately revised the privilege to allow both cleric and penitent to hold the privilege. Corsie v. Campanalonga, 317 N.J.Super. 177, 183, 721 A.2d 733 (App.Div.1998), rev'd in part on other grounds, 160 N.J. 473, 734 A.2d 788 (1999). Yet, the Legislature's 1994 amendment reversed the 1981 amendment and limited the privilege to "communications" rather than to both "communications" and "the very fact of the existence of all `confidential relations' involving those [the cleric] was counseling." Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 511 (2000). This same 1994 amendment also introduced "the generic term `cleric' and specified that priests and rabbis were included within that class, but otherwise left that aspect of the privilege unchanged." Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 511 (2000).
Currently, N.J.S.A. 2A:84A-23 and N.J.R.E. 511 define the cleric-penitent privilege, in pertinent part, as follows:
Any communication made in confidence to a cleric in the cleric's professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which the cleric belongs or of the religion which the cleric professes, shall be privileged. Privileged communications shall include confessions and other communications made in confidence between and among the cleric and individuals, couples, families or groups in the exercise of the cleric's professional or spiritual counseling role.
Accordingly, based on this language, three elements must be present for the privilege to apply; a person's communication must be made: (1) in confidence; (2) to a cleric; and (3) to the cleric in his or her professional character or role as a spiritual advisor. Considering the privilege language, and the circumstances of this case, the first issue presented is whether Deacon Perry is a "cleric" as defined by the privilege.

II.
The applicable statute and rule defines "cleric" as "a priest, rabbi, minister or other person or practitioner authorized to perform similar functions of any religion." *624 Ibid. The defendant argues that Perry qualified as a "cleric" because he was authorized to perform functions similar to those performed by a priest, minister or rabbi. The motion judge concluded that Perry was a cleric because "his duties mirror and support that of the pastor," he was ordained, and had a wide range of responsibilities.
In re Murtha, supra, 115 N.J.Super. at 386-87, 279 A.2d 889, addressed this issue to determine whether a Catholic nun fell within the definition of "clergyman." At that time, the rule and statute included "a clergyman, minister or other person or practitioner authorized to perform similar functions[.]" Id. at 386, 279 A.2d 889.
The Murtha court concluded that the nun "did not, and obviously could not, show that she was a person or practitioner authorized to perform functions similar to those performed by a clergyman or ministermore specifically, by a priest." Ibid. The court found that the nun was a "religieuse" or "a dedicated member of a teaching order of nuns, but she admittedly did not conduct any type of religious services involving pupils in the school, nor did she carry on any of the religious functions of a priest, such as hearing confessions or giving absolution." Ibid. Further, the court was unable to find anything in the Catholic doctrine or practice that would allow a nun to claim the privilege. Id. at 387, 279 A.2d 889.
In Szemple, both the Appellate Division and Supreme Court assumed, without deciding, that the individual involved in that case, Bischoff, qualified as a clergy person covered by the rule. Szemple, supra, 135 N.J. at 421 n. 2, 640 A.2d 817; see also State v. Szemple, 263 N.J.Super. 98, 107 n. 3, 622 A.2d 248 (App.Div.1993). Although the trial court found that Bischoff was not a clergy person, neither party raised or briefed the issue and, therefore, neither appellate court addressed it. Ibid. The facts of the case revealed, however, that Bischoff was a deacon, ordained as a Minister of Visitation, and that he visited the sick, elderly and imprisoned "to comfort them and discuss their religious needs and concerns." Szemple, supra, 135 N.J. at 412-13, 640 A.2d 817.
In the present case, Pastor Williams testified that deacons prayed with individuals, saved souls and administered and read scripture and responsive readings. The pastor added that in his absence, deacons "are the ones who are responsible for filling the pulpit. They are the ones who are responsible for seeing the sick. As a matter of fact, they are the next in line, associate ministers ... don't have the right. Deacons do." The pastor further described deacons as follows:
Deacons are the pastor's arm bearer. They're the ones who help the pastor in ministering to the congregation and the pastor leans on them in times of circumstances and situations where he needs their counsel because they are the ones who are going to be with them.
Deacon Perry testified that he had prayed with people and visited the sick. Although Perry indicated that he had never preached a sermon, he testified that he could preach a sermon if asked to do so or if necessary to fill in for the pastor.
The Baptist Deacon, supra, at 43-45, explains that a deacon is ordained and selected by the Baptist Church for service. While no specific tasks are assigned to deacons in the Scriptures, this manual indicates that a deacon is required to serve the congregation in his personal capacity by leading prayer, as well as visiting the sick and handling the administration of the everyday affairs of the church. Id. at 61, 69-87. Moreover, the "deacons have a special responsibility for the pulpit in the absence of the pastor." Id. at 85.
We note that the language defining "cleric" is ambiguous and bears several meanings. For example, the phrase "other person or practitioner authorized to perform similar functions" could refer solely to spiritual leaders in sects other than those led by the specifically referenced *625 "priest, rabbi, or minister." Thus, a Baptist Pastor, while not specifically included within the definition of "cleric," is certainly "authorized to perform similar functions" to those of a priest, rabbi or minister. No one in this case seriously contends that the pastor is not a "cleric" under the statute.
However, the privilege language could also include persons who assist the main cleric. In this instance the language is also unclear as to whether such a person needs to be "authorized to perform" all or only some of the "similar functions" of the sect's spiritual leader or a "priest, rabbi or minister."
Also ambiguous is whether the religious body must authorize the putative cleric to perform any "similar functions" or only those functions that warrant and require confidential communication, such as counseling and advising, or where members of the congregation participating in the function would expect that their communication with the authorized person would be confidential. See, e.g., State v. Lender, 266 Minn. 561, 124 N.W.2d 355 (1963) (denying privilege to communications made to employee of Catholic Welfare agency who performed counseling under the direction of a priest).
In this case, however, we need not resolve any of these ambiguities, and need not define "cleric" in all of its ramifications. It is also not necessary to decide definitively whether all deacons are clerics. Even assuming that Perry was a cleric, we conclude that the motion judge erred by protecting a statement that did not meet the third element required to sustain the privilege, i.e., that the communication was made in confidence in the cleric's "professional character, or as a spiritual advisor."

III.
The motion judge decided that Perry was a cleric and, therefore, the privilege applied. Generally, however, privileges are narrowly construed, State v. Schreiber, 122 N.J. 579, 582-83, 585 A.2d 945 (1991), because they are "obstacles in the path of the normal trial objective of a search for the ultimate truth." State v. Briley, 53 N.J. 498, 506, 251 A.2d 442 (1969). "They are accepted only because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure." Ibid. Therefore, privileges should always "be construed and applied in a sensible accommodation to the aim of a just result." Ibid. Our interpretation, therefore, should protect the policy driving the privilege without too broadly impairing the trial's search for the truth. In re Grand Jury Investigation, 918 F.2d 374, 383 (3d Cir.1990) (citing In re Grand Jury Impaneled January 21, 1975, 541 F.2d 373, 382 (3d Cir.1976)).
To be privileged, confidential communications must be made to a cleric "in the cleric's professional character, or as a spiritual advisor in the course of the discipline... of the religious body to which the cleric belongs or ... the cleric professes[.]" N.J.R.E. 511. Thus, for example, in Corsie, supra, 317 N.J.Super. at 182, 721 A.2d 733, the court considered a Vicar who served "as a confidant to priests in need." The court found it "undisputed that the Vicar was acting in his `professional character or as a spiritual adviser,' when, or if, [the defendant] confided in him respecting the alleged sexual assaults or any other personal or professional matter." Id. at 183, 721 A.2d 733. When the communication is not made in such capacity, it is not privileged. For example, in State v. Drelich, 123 A.D.2d 441, 506 N.Y.S.2d 746, 748 (App.Div.1986), the New York court addressed whether communications were privileged under statutory language similar to that of New Jersey, i.e., "`a clergymen, or other minister ... shall not be allowed to disclose a confession of confidence made to him in his professional character as spiritual advisor.'" Accord State v. Schultz, 161 A.D.2d 970, 557 N.Y.S.2d 543 (App.Div.), appeal denied, 76 N.Y.2d 944, 563 N.Y.S.2d 73, 564 N.E.2d 683 (1990). In Drelich, the court affirmed *626 the lower court's determination that the defendant's communications were not made to a rabbi "`in his professional character as spiritual adviser'" because these communications were made "for the secular purpose of seeking assistance in the retention of counsel, and in negotiating with the prosecutor's office and securing other assistance in connection with the preparation of his defense to the charges[.]" Drelich, supra, 506 N.Y.S.2d at 748. The defendant conceded that he sought out this particular rabbi because of the rabbi's "`connections'" in the secular world. Id. at 747.
While the State contends that Cary visited the Second Baptist Church merely to facilitate his surrender to the police, this is far from clear. Cary made repeated attempts to reach Pastor Williams via telephone before actually visiting the church. Further, once at church, Cary attended morning services before he was able to speak to the pastor. Cary then met the pastor alone for a conference that the pastor described as to "spiritually advise [defendant] on ... whatever I could do to help him spiritually.In making the right decision." Moreover, only after Cary's initial meeting with the pastor did Pastor Williams indicate that defendant had decided to surrender to the police. Only then, did the pastor summon Deacon Perry for help in this regard.
The uncontested evidence, however, reflects a dual role played by Perry in his relationship with Cary; he acted as both deacon and police officer. Pastor Williams did not summon Deacon Perry for help until Cary had decided he wanted to surrender. Perry indicated that part of his role in meeting with defendant was spiritual in nature. Yet, Perry also testified that he introduced himself to Cary as both a deacon and state trooper. During their conference, despite praying with Cary, Perry reminded defendant of his right to remain silent and, in fact, at one point, searched Cary. It is obvious that Perry acted in both capacities during his meeting with Cary and understood that he was present to perform the secular function of assisting defendant's surrender to the police. Moreover, given the fact that Cary knew Perry was a State Trooper and that Perry warned Cary of his right to remain silent and searched Cary, it is difficult to comprehend how Cary could have "reasonably expected" that his communications with Perry would remain confidential. State v. List, 270 N.J.Super. 169, 175, 636 A.2d 1054 (App.Div.1993). As Murtha noted: "[defendant] had, quite simply, come to [the nun] for support and help in a time of great trouble, ready to go to the police and tell what happened .... [The nun] accompanied [defendant] ... to the police station. Any claim of confidentiality and privilege evaporates in such a factual setting." Murtha, supra, 115 N.J.Super. at 388, 279 A.2d 889.
Therefore, given Perry's dual capacity during Cary's confession, Cary's communications to Perry were not made in a deacon's "professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body ...." The communications were made to Perry when he was at least partially performing a secular function as a law enforcement official, and are not privileged. See, e.g., Sanborn v. Commonwealth, 892 S.W.2d 542 (Ky.1994) (finding no privilege when minister consulted as potential death penalty expert in course of which defendant revealed crime details); Masquat v. Maguire, 638 P.2d 1105 (Okla.1981) (holding privilege did not apply where cleric was a hospital administrator and approached in that role); but see State v. Jackson, 77 N.C.App. 832, 336 S.E.2d 437 (1985) (finding communications privileged even though cleric also simultaneously functioning in unprivileged role as mother of victim and defendant's aunt).

IV.
For the above explained reasons, we reverse the motion judge's decision and rule that defendant Cary's communications *627 with Deacon Perry, under the circumstances of this case, are not protected under the cleric-penitent privilege. In the course of this decision we have made some reference to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We do not reach the question whether the communication might be inadmissible under Miranda or for any other reason. We hold only that Cary's communications to Deacon Perry were not made in confidence in the deacon's professional character or as a spiritual advisor, and are not privileged under N.J.S.A. 2A:84A-23 or N.J.R.E. 511.
Reversed and remanded for further proceedings in accordance with this decision.