The State responds to defendant's argument that his "convictions for making false alarms should have been merged with his convictions for official misconduct," by referring to the anti-merger provision of *N.J.S.A.* 2C:30–7b. However, that section relates only to merger of convictions with or into the pattern offense. *See N.J.S.A.* 2C:18; *Dillihay, supra,* 127 *N.J.* at 46, 601 *A.*2d 1149; *State v. Best,* 70 *N.J.* 56, 356 *A.*2d 385 (1976); *State v. Davis,* 68 *N.J.* 69, 77–82, 342 *A.*2d 841 (1975).

We order merger of the false alarm convictions and remand for the correction of judgment. The judgment of conviction and sentences for official misconduct and pattern of misconduct are affirmed.

953 A.2d 1214

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. J.G., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 21, 2008—Decided August 20, 2008.

Before Judges WEFING, PARKER and KOBLITZ.

*Nancy A. Hulett,* Assistant Prosecutor, argued the cause for appellant (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney; *Ms. Hulett,* on the brief).

*Michele Labrada,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Labrada,* on the brief).

The opinion of the court was delivered by

PARKER, J.A.D.

On leave granted, the State appeals from an order entered on December 10, 2007 granting defendant's motion to preclude the testimony of Glenford Brown pursuant to *N.J.R.E.* 511, [cleric]-penitent privilege. We reverse.

This appeal arises out of allegations that defendant sexually assaulted his daughters between 1996 and 2000. In 2000, the children reported to their mother that their father had sexually abused them. The mother then contacted her pastor, Glenford Brown, and reported the children's allegations. Brown knew defendant from their native Jamaica, although defendant, himself, did not attend Brown's church in New Jersey.

Believing he had a duty to protect defendant's wife and children, Brown called defendant at work to tell him he should not go back to his home. Brown arranged to meet defendant outside Brown's townhouse—because Brown would not allow defendant into his house. They talked in a play area behind Brown's house where defendant, "without directly saying [he] sexually molested them, ... acknowledged what he did" and asked Brown to persuade his wife to let him back in the house. Brown told defendant he would not do that. Defendant asked Brown "to counsel" him but Brown declined because he was too angry with defendant and defendant "needed real psychological help which [Brown] was not qualified to give." A few weeks later, defendant went to Brown's church where he talked with Brown and "acknowledged what he did." Defendant asked Brown to baptize him, but Brown told defendant he could not baptize him because Brown "thought he wanted cover for his actions." Brown urged defendant to turn himself in to the police.

After a hearing, during which Brown gave the testimony related above, the trial court rendered a decision on the record of October 25, 2007, granting defendant's motion to preclude Brown's testimony under the privilege. Relying on the three-part test articulated in *State v. Cary,* 331 *N.J.Super.* 236, 241, 751 *A.*2d 620 (App.Div.

2000), the court found that the statements made to Brown by defendant were privileged.

The State, in this interlocutory appeal, argues:

*POINT ONE*

THE TRIAL JUDGE IMPROPERLY RULED THAT DEFENDANT'S MEETING AND CONVERSATION WITH GLENFORD BROWN WAS PROTECTED UNDER THE CLERIC–PENITENT PRIVILEGE.

■ The State contends that defendant's communications to Brown are not protected under the cleric-penitent privilege because the circumstances surrounding the communications did not demonstrate that they were made in confidence to Brown in his role as a spiritual advisor. The State contends that the trial court's ruling is contrary to both the evidence and the law. We agree.

Pursuant to both *N.J.S.A.* 2A:84A–23 and *N.J.R.E.* 511, under the cleric-penitent privilege

> [a]ny communication made in confidence to a cleric in the cleric's professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which the cleric belongs or of the religion which the cleric professes, shall be privileged. Privileged communications shall include confessions and other communications made in confidence between and among the cleric and individuals, couples, families or groups in the exercise of the cleric's professional or spiritual counseling role.

The privilege belongs to both the cleric and the person making the communication, and either can invoke it. *N.J.S.A.* 2A:84A–23; *N.J.R.E.* 511.

■ In *Cary*, we articulated a three-part test for application of the cleric-penitent privilege. To warrant protection, "a person's communication must be made: (1) in confidence; (2) to a cleric; and (3) to the cleric in his or her professional character or role as a spiritual advisor." 331 *N.J.Super.* at 241, 751 *A.*2d 620.

■ Generally, "privileges are to be narrowly construed." *State v. Szemple*, 135 *N.J.* 406, 413, 640 *A.*2d 817 (1994), *superseded by N.J.S.A.* 2A:84A–23. Because privileges can " 'undermine the search for truth in the administration of justice,' . . . they are accepted only to the extent that they outweigh the public interest

in the search for truth." *Id.* at 413–14, 640 *A.*2d 817 (quoting *State v. Dyal,* 97 *N.J.* 229, 237, 478 *A.*2d 390 (1984)). Privileges "are accepted only because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure." *State v. Briley,* 53 *N.J.* 498, 506, 251 *A.*2d 442 (1969). Thus, they should "be construed and applied in a sensible accommodation to the aim of a just result." *Ibid.*

Here, the State argues that the trial court failed to construe the privilege narrowly. The State contends that the trial court judge: (1) "completely failed to give any regard to the pastor's explanation of the circumstances that gave rise to the outdoor meeting with defendant" that "it had no religious purpose to it at all;" (2) "failed to properly analyze the circumstances under which Pastor Brown met with defendant;" and (3) impermissibly relied on the length of defendant's relationship with the pastor.

In *Cary,* we considered whether the cleric-penitent privilege applied to a defendant who confessed to a Baptist deacon who was also a New Jersey State Trooper. 331 *N.J.Super.* at 238, 751 *A.*2d 620. The defendant, Cary, was involved in an altercation in which he allegedly fired several gun shots into a store striking two bystanders, killing one and injuring the other. *Ibid.* A few days after the incident, Cary met privately with his pastor at his church in Belleville, "apparently to seek spiritual guidance regarding the altercation and how he should proceed." *Ibid.* After the meeting, Cary informed the pastor that he wanted to surrender to the police. *Ibid.* The pastor summoned a recently ordained deacon, who was also a state trooper, to determine how to handle the matter with Cary. *Ibid.*

When the pastor and the deacon met with Cary, the deacon introduced himself as a deacon in the church and as a state trooper. *Ibid.* While Cary related certain events to the men, the deacon reminded Cary of his right to remain silent. *Id.* at 239, 751 *A.*2d 620. Moreover, during the meeting, the deacon had Cary "stand against the wall and spread his arms and legs in a traditional search posture" while the deacon searched him. *Ibid.*

At some point during the meeting, however, all three men prayed together. *Ibid.*

In deciding that Cary's communications to the deacon were not privileged, we noted the deacon's dual role in his relationship to the defendant. *Id.* at 246–47, 751 *A.*2d 620. The deacon identified himself as both a deacon and state trooper; reminded Cary of his right to remain silent and, despite praying with him, searched him. *Id.* at 246, 751 *A.*2d 620. Given these circumstances, we found it "difficult to comprehend how Cary could have 'reasonably expected' that his communications with [the deacon] would remain confidential." *Ibid.* (quoting *State v. List,* 270 *N.J.Super.* 169, 175, 636 *A.*2d 1054 (App.Div.1993)).

In *In re Murtha,* 115 *N.J.Super.* 380, 388, 279 *A.*2d 889 (App. Div.), *certif. denied,* 59 *N.J.* 239, 281 *A.*2d 278 (1971), where the defendant made certain statements to a nun, we found that the privilege did not apply. There, the nun invoked the privilege and refused to testify about the conversation she had with the defendant. *Id.* at 381–82, 279 *A.*2d 889. We found that "[h]er posture ... was not that of a person standing in the relation of a priest hearing [the defendant's] confession or confidential communication." *Id.* at 387–88, 279 *A.*2d 889. Instead, the "[defendant] had, quite simply, come to [the nun] for support and help in a time of great trouble, ready to go to the police and tell what happened.... [The nun] accompanied [defendant] ... to the police station. Any claim of confidentiality and privilege evaporates in such a factual setting." *Id.* at 388, 279 *A.*2d 889.

In *Corsie v. Campanalonga,* 317 *N.J.Super.* 177, 182–84, 721 *A.*2d 733 (App.Div.1998), *rev'd in part on other grounds,* 160 *N.J.* 473, 734 *A.*2d 788 (1999), plaintiffs alleged that they were sexually abused by defendant, a former Catholic priest. *Id.* at 180, 721 *A.*2d 733. There, we found that correspondence or communications in files maintained by the Vicar for Priests were protected by the privilege. *Id.* at 183, 721 *A.*2d 733. The Vicar testified that he was acting in his "professional character, or as a spiritual advisor" when a priest confided in him regarding certain alleged

sexual assaults. *Ibid.* Similar to a confessional matter with any other penitent, priests often confide in the Vicar with the expectation of privacy and confidentiality. *Ibid.* We concluded that "so long as [the priest's] communications to the Vicar were 'confessions' or otherwise made with the expectation of confidentiality, these communications are protected against disclosure." *Id.* at 184, 721 *A.*2d 733. We remanded the matter for the trial court to review the Vicar's files *in camera* to determine which documents were " 'confessions' or otherwise made with the expectation of confidentiality." *Ibid.*

The State also relies on *Magar v. State*, 308 *Ark.* 380, 826 *S.W.*2d 221, 222–23 (1992), wherein the Arkansas Supreme Court considered whether a conversation Magar had with a minister was made in confidence on the ground that Magar and the minister had previous counseling sessions, which the minister had assured Magar were private. 826 *S.W.*2d at 222. Essentially, Magar relied upon "a purported established relationship of confidentiality between himself and [the minister] when he discussed the issues later involved at his trial." *Ibid.* The minister testified that members of his church, the parents of two boys, told him that their sons had been sexually molested by Magar. *Ibid.* When the minister confronted Magar with the allegations, he admitted they were true. *Ibid.*

The minister also testified that "confession [was] not a tenet of his church and keeping evidence of a crime confidential is within the discretion of the pastor." *Ibid.* Although the minister generally regarded the information gained in a counseling relationship as confidential, this particular conversation with Magar was "disciplinary in nature." *Ibid.* Moreover, the minister "did not tell Magar that the conversation was confidential, nor did Magar ask that it be kept confidential." *Ibid.*

In determining that Magar's communication was not made to the minister "in his professional character as a spiritual advisor," the court found it significant that the minister sought Magar to confront him with the allegations. *Id.* at 222. The court was also

influenced by the minister's testimony that the conversation was disciplinary in nature and not for counseling purposes. *Id.* at 222–23. The court determined that "[t]he attendant circumstances support the trial court's decision that this was an accusatory situation initiated by [the minister] that did not encompass spiritual counseling, thereby precluding Magar˙ from excluding [the minister's] testimony at trial." *Id.* at 223.

Courts in other jurisdictions have interpreted similar statutory provisions, declining to apply the privilege when the communications were not related to religious or spiritual concerns. *See e.g.*, *Keenan v. Gigante*, 47 *N.Y.*2d 160, 417 *N.Y.S.*2d 226, 390 *N.E.*2d 1151, *cert. denied*, 444 *U.S.* 887, 100 *S.Ct.* 181, 62 *L.Ed.*2d 118 (1979) (finding privilege was inapplicable to defendant's communications to priest where the communications were made for purpose of securing defendant's admittance into a work release program); *Burger v. State*, 238 *Ga.* 171, 231 *S.E.*2d 769 (1977) (holding defendant could not claim privilege concerning conversation with a clergy member who was his friend and frequent companion regarding defendant's intent to kill his wife and her lover). A "common thread in these cases is that the privilege may not be invoked to enshroud conversations with wholly secular purposes solely because one of the parties to the conversation happened to be a religious minister." *People v. Carmona*, 82 *N.Y.*2d 603, 606 *N.Y.S.*2d 879, 627 *N.E.*2d 959, 962 (1993).

Although this court is not bound by *Magar*, we consider it factually similar to the facts here. As in *Magar*, defendant, who was charged with sexual assault, claimed the conversations he had with Brown were made in confidence. Brown reached out to defendant, as did the minister in *Magar*, and when confronted with the allegations, defendant admitted to them.

Brown testified that the purpose of his conversation with defendant was not for counseling but to protect defendant's wife and children. During their initial conversation defendant asked for Brown's counsel and help. Brown refused to counsel defendant, however, and told defendant that he needed psychological help.

The pastor indicated only that he could "probably try to help find an organization that [could] counsel [defendant]," but Brown stated that he could not help defendant. Although they were the only individuals present during their conversations, Brown never informed defendant that their conversations would be confidential.

Applying the *Cary* test, we find that although Brown was a cleric and spoke to defendant without anyone else present, (1) defendant did not ask and Brown did not offer to keep the conversation confidential; (2) Brown reached out to defendant— not as a spiritual advisor—but to protect defendant's children; and (3) Brown specifically told defendant he could not counsel him or even baptize him because defendant needed professional help. Clearly, the conversations between defendant and Brown are not protected by the privilege.

Reversed and remanded for further proceedings.