[Crim. No. 13024. Fourth Dist., Div. One. July 1, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
DALE DEAN THOMPSON, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Paul Bell, Deputy Public Defender, and William Pabarcus for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STANIFORTH, Acting P. J.**—After an unsuccessful motion to suppress statements under the clergyman-penitent privilege (Evid. Code, § 1030), defendant Dale Dean Thompson was convicted by a jury of murder in the first degree for the 1977 killing of Dennis M. Duncan. There was a true finding as to a weapons use in the murder. (Pen. Code, § 12022.5.) Thompson was sentenced to the term prescribed by law for the murder and firearm use. He appeals contending the trial court erroneously admitted into evidence the contents of Thompson's conversation with James A. Ward as well as a handwritten "confession" given to Ward. He asserts that his statements, as well as the handwritten confession, were protected by the clergyman-penitent privilege. He further argues that if not protected by the clergyman-penitent privilege, the communications were confidential and should be excluded as part of the counselor-counselee relationship. Thompson also contends the trial court improperly restricted defense counsel's cross-examination of Ward.

FACTS

About 7 a.m. on August 5, 1977, Dennis M. Duncan was driving his motorcycle on Interstate 5 near H Street in Chula Vista. A dark-colored car occupied by two light-skinned persons approached Duncan's motorcycle. Something protruded out of the driver's window and several shots were fired. Duncan's motorcycle weaved and fell to the ground. The witness to the shooting, Mary Jane Delphenich, was unable to identify the assailants. Duncan suffered four gunshot wounds, including a fatal wound in the chest. The autopsy showed the bullets were .22 cali-

ber, 39 grams and nonjacketed, and they were consistent with those operable in a 350 or 351 series Mosberg rifle.

Reginald J. Fritschle was Thompson's stepfather and owned a .22 semiautomatic Mosberg rifle with a telescopic sight. He noticed the rifle was missing in March 1979. Neither Thompson nor his brother had a key to the house. About the time Fritschle noticed the rifle missing, he saw the landlady take away some of his possessions.

Nearly three years after the shooting, in June of 1980, Thompson was employed as a water softener salesperson in Los Angeles. He had a series of conversations with James A. Ward who was counselor to the salespersons of the Miracle Water Company. Ward's function was to help them increase sales. Virtually all the employees of the Miracle Water Company were members of the Church of Scientology. Ward was introduced to the salespersons as a result of his training in Scientology.

Thompson told Ward he had committed a murder. Ward told Thompson he should write down a confession and turn himself in. Thompson wrote what he had told Ward and gave this written confession to Ward. The writing was introduced into evidence at trial. According to Thompson's written statement he had talked to Rose Duncan, decedent's wife, about her desire to have her husband killed in order to collect insurance monies. He told her he knew someone who could do it for $30,000—$600 in advance and the rest payable from the insurance proceeds. Thompson wrote further that he and his brother planned the shooting. After much practice with the rifle, Thompson and his brother drove past the motorcycle-riding Duncan. Thompson rapidly fired 11 shots, killing Duncan. He then telephoned Rose Duncan to tell her the act had been done. Rose Duncan received $132,105.19 in insurance proceeds. She never paid Thompson any additional monies. A year before the murder (1976) Rose Duncan was convicted of the crime of soliciting someone (other than Thompson) to kill her husband.

Thompson testified and denied personal involvement in the killing. He admitted making the oral and written statements to Ward but explained he did it to test Ward's claim that nothing he could say would upset or shock him. He admitted meeting Rose and Dennis Duncan about four months before Dennis' death; he learned about Duncan's death on the radio; the detailed information contained in his statement

to Ward came from facts learned from a combination of television, radio and newspaper accounts and from talking to Rose Duncan.

Thompson testified Ward told him he had reached the level of "operating thetan"[1] in the Church of Scientology. Thompson said Ward had assured him that Ward was a minister and anything he told Ward would go no further.

Ward testified he was trained as an "ethics officer" but he did not hold himself out as an ethics officer. He had not been ordained as an "auditor" or minister of the Church of Scientology. After Thompson orally confessed the murder to Ward, Ward told him it would be better to write it down. Ward told Thompson to turn himself in and if he did not do so, Ward would. Thompson was told this *before* he wrote out the confession. Ward does not recall telling Thompson his statements were confidential.

---

[1] The Church of Scientology is an organized outgrowth of the theories of L. Ron Hubbard, as described in the 1950 book, Dianetics, the Modern Science of Mental Health. A discussion of the Scientology philosphy can be found in Wallis, The Road to Total Freedom, A Sociological Analysis of Scientology (1977) (Road), in particular chapter 4, "Theory and Its Transmission" from which the following terminology and principles relevant to an understanding of Thompson's contentions are taken. According to Scientology theory, the true self of every individual is the "thetan," or directing life force. The thetan is immortal, omniscient, and omnipotent, and has existed since before the beginning of matter, energy, space, and time. The physical universe is created by thetans bored with their existence, who have entered into a game in which they assume physical bodies and accept limitations on their powers. The thetans eventually forgot their origins and lost the ability to mobilize their spiritual capacities. (Road, *supra*, pp. 103-104.) Each thetan has occupied many previous bodies, and has accumulated many experiences. These memory traces, called "engrams," cloud the mind and make it unable to function at the high level of mental and emotional well-being of which it is otherwise capable. Scientology is supposed to "clear" the mind of these engrams and restore the thetan to its original capabilities. (Road, *supra*, at p. 104.)

The basic element of this processing is called "auditing." A trained auditor questions the subject, who is called the "preclear," in an attempt to destroy the troubling engrams, and put the thetan in control. The auditor is assisted in this process by the "E-meter," a skin galvanometer which measures changes in the electrical conductivity of the skin. (Road, *supra*, at pp. 113-118.) An auditing session is also referred to as a "confessional." Auditors are ministers of the Church of Scientology. (Evans, Cults of Unreason (1973) p. 81.) Auditors do not divulge what comes out in an auditing session.

The goal of this processing is to reach the state of "clear" and to move even beyond that to become an "operating thetan," or "O.T." A "clear" is "'[a] thetan who can be at cause knowingly and at will over mental matter, energy, space and time as regards the First Dynamic (survival for self).'" An "O.T." is "'a Clear who has been familiarized with his environment to a point of total cause over matter, energy, space, time and thought, and who is not in a body.'" (Road, *supra*, at p. 109, quoting the Scientology Abridged Dictionary (1970).)

William Smith, owner of Miracle Water, said Ward offered his services as an ethics officer in order to improve sales. The day Thompson talked to Ward, Thompson asked Smith if his statements would be protected from anyone outside Scientology. Smith said yes. Both the magistrate at the preliminary hearing and the trial court held the clergyman-penitant privilege was inapplicable.

DISCUSSION

I

Thompson contends the trial court erroneously admitted the contents of his conversation with Ward as well as his handwritten confession given to Ward.

A penitent has a privilege to refuse to disclose and to prevent another from disclosing a communication made in confidence to a clergyman, who in the course of the discipline or practice of his church, denomination or organization is authorized or accustomed to hear such communications and, under the discipline or tenets of his church, has a duty to keep such communications secret. (See Evid. Code, §§ 1033, 1032; *People v. Johnson* (1969) 270 Cal.App.2d 204, 208 [75 Cal.Rptr. 605].) A clergyman is broadly defined as a "priest, minister, religious practitioner, or similar functionary of a church or of a religious denomination or religious organization." (Evid. Code, § 1030.) While the privilege is present, there is little guidance to its understanding in the case law or the statute here involved.

Some light comes from out-of-state authorities.[2] In *Reutkemeier v. Nolte* (1917) 179 Iowa 342 [161 N.W. 290], the court held the unordained elders of the Presbyterian church were subject to the clergyman-penitent privilege. It so held, however, because such elders were responsible for the spiritual life of the church and its members. In *In re Murtha* (1971) 115 N.J. Super. 380 [279 A.2d 889], a Catholic nun was held not subject to the privilege since the Catholic church did not allow the nun to perform the function of taking confession. In *In re Verplank* (C.D. Cal. 1971) 329 F.Supp. 433, the federal court pointed out there was no federal law establishing such a privileged communication but declared a communication to a nonprofessional draft counselor confidential. The court reasoned that since a religious leader had been chosen to head the draft counseling services provided by Claremont

[2](See Annot. Communication to Clergymen as Privileged, 71 A.L.R.3d 794, 804, 806, 809, for compilation of out-of-state holdings.)

Colleges, it was anticipated such decisions involving the draft were of a spiritual nature and thus confidential. (*Id.*, at p. 435.) The court found, just as nonprofessional representatives aiding attorneys were subject to the attorney-client privilege, those counselors working directly with the Protestant minister heading the counseling services for draftees were also subject to the privilege because their duties involved in large measure those of the clergyman.

These cases teach that a threshold question must be determined before any privilege applies: What is the nature of the function being performed by the person who received the statement?

*People* v. *Johnson, supra,* 270 Cal.App.2d 204, provides some insight on this point. In *Johnson,* the defendant, following an armed robbery, was chased by police. He crashed the getaway car, ran into a church, and explained his situation to John Piper, the minister. When the defendant approached Piper the latter was in his office, dressed in a business suit, and not in the vestments of the church. Piper suggested the defendant turn himself in and in defendant's presence Piper told police his statement. The court concluded that not every statement made to a clergyman was privileged. (*Id.*, at p. 207.) Rather, it is necessary to show that *the statement was made in confidence or in the course of the required relationship.* There was no evidence to demonstrate that Piper was authorized or accustomed to hearing such communications nor was it shown he had a duty to keep such statements confidential. (*Id.*, at pp. 207-208.)

In applying these rules to the case at bench, it appears Ward testified he was aiding the Miracle Water Company in an attempt to increase poor sales. While Ward did have training as an ethics officer under the tenets of Scientology, he was not hired as an ethics officer nor was he an auditor of the church authorized to take confidential statements. Ward stated he had studied some teachings of the church; but he was also a Catholic and at no time a staff member of the church. His function with Miracle Water Company was solely as a business consultant whose purpose was to help to improve sales.

Contrary to Thompson's statement, there was no assurance of confidentiality, according to Ward. After the oral confession, Ward said he told Thompson to turn himself in immediately and if he failed to do so, Ward would. In this circumstance, it cannot be said as a matter of fact

or law that Ward was a spiritual counselor to whom Thompson's communications were confidential. The clergyman-penitent privilege is rooted in the imperative need for *confidence and trust* between the relator and the recipient. "The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." (*Trammel* v. *United States* (1980) 445 U.S. 40, 51 [63 L.Ed.2d 186, 195, 100 S.Ct. 906, 913.].) Both the preliminary hearing magistrate and the trial court made a factual determination that Ward was not introduced to the employees as an ethics officer and had not assumed the role of a clergyman. Substantial believable evidence supports the conclusion the confession was not made to Ward in confidence; its purpose was not to confess to a flawed act and to receive religious consolation and guidance in return. Substantial evidence supports the trial court's denial of Thompson's claim of the penitent privilege based upon lack of required relationship as well as lack of expectation of confidentiality. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

## II

■ Thompson, in the alternative, seeks recognition of a counselor-counselee relationship which would require statements to such counselor to be considered confidential. Neither the Evidence Code nor case law establish such a privilege. In *Simrin* v. *Simrin* (1965) 233 Cal.App.2d 90 [43 Cal.Rptr. 376], a rabbi undertook the role of marriage counselor, but before doing so, all the parties agreed that any statements made would be confidential. The *Simrin* court refused to uphold the clergyman-penitent privilege on the ground the rabbi was not performing a function usually associated with his role as a spiritual advisor. But the court ultimately held the communications confidential as a matter of public policy in an attempt to preserve the marital unit. (*Id.*, at pp. 94-95.) Here, Ward's role cannot be analogized to that of the rabbi in *Simrin*. Ward's function was that of a business advisor. No similar public policy compels withholding critical evidence of a crime surfacing in this, a business, setting.

■ "Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence.' *United States* v. *Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730 . . . . As such, they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding

relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' *Elkins* v. *United States*, 364 U.S. 206, 234, 80 S.Ct. 1437, 1454 ...." (*Trammel* v. *United States* (1980) 445 U.S. 40 [63 L.Ed.2d 186, 100 S.Ct. 906].)

Admitted, the clergyman-penitent privilege is designed to protect weighty and most legitimate interests. However, exceptions to the demand for "every man's evidence" are not to be lightly created nor expansively construed for they are in derogation of the search for truth. (*United States* v. *Nixon* (1974) 418 U.S. 683, 710 [41 L.Ed.2d 1039, 1065, 94 S.Ct. 3090].) The admission into evidence of either the oral statement or the written confession does not contravene any as yet unarticulated counselor-counselee privilege.

## III

■ Thompson next contends the trial court impermissibly restricted cross-examination of Ward when it refused to allow Ward to answer questions concerning his psychic abilities. In cross-examination defense counsel sought to find out Ward's capability as a psychic by such questions as "[Do you] kind of tune yourself into—Let's call it the soul of another human being so that you know where they are physically located, even though they are far out of your sight?"[3]

■ A trial court should allow wide latitude in the scope of cross-examination, particularly in circumstances involving a witness against a defendant in a criminal prosecution. (*People* v. *Murphy* (1963) 59 Cal.2d 818 [31 Cal.Rptr. 306, 382 P.2d 346].) However, the scope of cross-examination is not without limit. The trial court has both the power and the duty to confine cross-examination to relevant and material matters. To determine the proper balance between material and immaterial, the relevant and irrelevant, the following test has been suggested. "Does the matter tend to disprove or clarify some relevant fact established by reasonable inference from the witness' express testimony on direct?" (Jefferson, Cal. Evidence Benchbook (1972) § 27.17, p. 391; see also Evid. Code, § 210, defining relevant evidence as that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.") Also in a criminal case, any evidence which tends to support the presumption of innocence

[3] These questions were also asked: "[Y]ou have sources of knowledge that aren't available to normal people; for example, hear voices that tell you things?" and "[D]id you ever state in Mr. Thompson's presence that you have a psychic ability to detect another person's physical presence at a large distance, say, 30 miles?"

is relevant. (*People* v. *Whitney* (1978) 76 Cal.App.3d 863, 869 [143 Cal.Rptr. 301].) In view of the wide scope of discretion granted to the trial judge, reversal is warranted only when the court's decision constitutes an abuse of that discretion. (*People* v. *Wein* (1977) 69 Cal.App.3d 79, 90 [137 Cal.Rptr. 814].)

■ In applying these rules to the questions put to Ward, certain conclusions become eminently clear. The questions asked of Ward did not tend to prove or disprove any fact in issue in this case. Whether Ward did or did not possess psychic powers would not in the least way attack his credibility or demonstrate a bias or bear on any issue as to the validity of Thompson's confession. Ward denied telling Thompson he possessed supernatural psychic powers. The trial court sustained the objection when Ward was asked whether he actually possessed such powers. The latter question does not, in reason or logic, have any bearing on the issue of whether Thompson's confession to Ward was true or untrue. Either an affirmative or negative answer to the challenged question would not tend to support the presumption of innocence. Answers to the questions could possibly obfuscate and confuse critical factual issues before the jury. The trial court's refusal to permit the answers was a wise exercise of discretion.

Judgment affirmed.

Work, J., and Cazares, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.