[No. A032616. First Dist., Div. One. June 9, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
SHERIDAN ANN EDWARDS, Defendant and Appellant.

**COUNSEL**

Paul N. Halvonik and Halvonik & Halvonik for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Ronald E. Niver and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RACANELLI, P. J.**—Defendant was convicted by the court, sitting without a jury, on four counts of grand theft (Pen. Code, § 487, subd. 1) following denial of her claim of a clergy-penitent privilege (Evid. Code, §§ 1030-

1034).[1] On appeal from the order granting probation, we affirmed the determination of the trial court. We granted rehearing to reconsider defendant's claim that inculpatory statements made by her to Father Rankin, an Episcopalian priest, were in the nature of a sacramental confession or "penitential communication" privileged from disclosure. We refile our original opinion as modified.

## FACTS

We recite the factual background against which the claim of statutory privilege is presented. (The facts underlying the embezzlement counts are essentially undisputed.)[2]

Around 8:30 p.m. on Sunday, August 5, 1984, defendant Sheridan Edwards telephoned Father William Rankin, the rector of St. Stephen's Episcopal Church in Belvedere, and said she urgently needed to talk to him about "a problem." Father Rankin, who was scheduled to leave early the next morning to attend a week-long meeting in Oklahoma, asked defendant, a church member, if her problem could wait until he returned. After defendant related she had already talked to Father Gompertz, another priest affiliated with St. Stephen's, who told her it was imperative to see Father Rankin immediately, they arranged to meet that evening at Father Rankin's office. At the meeting, defendant first declared she had done something almost "as bad as murder." She then requested that their conversation be confidential; Father Rankin agreed.

Defendant proceeded to tell Father Rankin that she needed his help in stopping payment on certain checks drawn against the account of St. Stephen's Guild, of which she served as treasurer. (In fact, the guild account was practically depleted due to her embezzlement of nearly $30,000 over a period of many months.) Defendant told him she had arranged to borrow money to cover her misappropriation but needed his help because the loan proceeds would not be available in time to prevent the checks authorized for issuance to various charities from being dishonored.

Because he was leaving the following day, Father Rankin believed he would be unable to provide a solution and eventually suggested two alternatives to defendant: he could keep her revelation in confidence as agreed, or he could talk to the church wardens on her behalf seeking their help in

---

[1] Unless otherwise indicated, all further statutory references are to the Evidence Code.

[2] During her testimony, defendant essentially admitted misappropriation of funds from the several accounts which were entrusted to her management. It appears that by the time of trial, she had made substantial—if not full—restitution of the defalcations.

solving the problem.[3] Defendant consented to the latter option. Father Rankin repeated the question whether that was the course of action defendant wanted to pursue, and she assured him it was. However, defendant testified that she felt she had no choice but to agree.[4]

Later that evening, Father Rankin called Daniel King, the senior warden, and informed him of defendant's visit and the two alternatives he presented. King agreed to handle the problem in Father Rankin's absence. Father Rankin also called Sandra Ogden, the junior warden, and asked her to attempt retrieval of the (worthless) checks before they were presented for payment; her efforts ultimately proved successful.

During the week of his absence, Father Rankin and the two wardens remained in frequent contact with defendant, but no resolution was reached. King testified that defendant told him she had taken some $27,000, which could not be discovered in an audit. (According to Ogden, defendant told her she had burned the incriminating checks.)[5]

King thereafter scheduled a meeting of the 15-member vestry for Saturday, August 11. Before the meeting, defendant showed Father Rankin a telegram from a loan agency indicating her loan had been approved. Upon the request of the vestry, defendant delivered to them pertinent records and documents with the explanation that she had destroyed some of the checks. Acting upon the advice of the controller of the diocese, the vestry decided the missing funds had to be reported to the police because their fidelity bond was otherwise at risk. Soon thereafter, King and other church members reported the incident to the local police resulting in the issuance of a search warrant. Various bank records, ledgers and cancelled checks seized during the authorized search of defendant's house were admitted in evidence at trial.

At the conclusion of the evidentiary stage of trial, the court determined that the clergy-penitent privilege did not apply and, in any event, was limited to testimonial as opposed to extrajudicial statements. The court then found defendant guilty as charged, including an enhancement pursuant to Penal Code section 12022.6, subdivision (a). Thereafter, sentence was

---

[3] As the lay leaders of the church, the wardens were responsible for its financial affairs.

[4] During that same conversation, defendant also revealed that she had taken funds from the accounts of several doctors for whom she managed property. Those defalcations are the basis of three of the charged counts consolidated for trial.

[5] Defendant testified that her purpose in seeking Father Rankin's help was to prevent the imminent public disclosure of insufficient funds in the guild's bank account. She stated her intention was to cover up her misdeeds once she had replenished the depleted account with funds from the materialized loan.

suspended and defendant placed on formal probation subject to certain conditions including four months in jail.

## DISCUSSION

Defendant argues that the trial court erred in allowing into evidence the content of her confidential statements to Father Rankin and other incriminating evidence obtained as a direct result thereof. We cannot agree.

Under the relevant statutory scheme, "a penitent . . . has a privilege to refuse to disclose, and to prevent another from disclosing, a penitential communication . . . ." (§ 1033.) A penitent is defined as one who has made a "penitential communication to a clergyman" (§ 1031) which in turn is defined as a confidential communication to a clergyman "who, in the course of the discipline or practice of his church, denomination, or organization, is authorized or accustomed to hear such communications and, under the discipline or tenets of his church, denomination, or organization, has a duty to keep such communications secret." (§ 1032; *People* v. *Thompson* (1982) 133 Cal.App.3d 419, 425 [184 Cal.Rptr. 72].) The focus of our inquiry is whether defendant's confidential statements to Father Rankin constituted a penitential communication within the meaning of the statutory privilege.

The present day clergy-penitent privilege has its origin in the early Christian Church sacramental confession which existed before the Reformation in England. It has evolved over the years into the contemporary "minister's" privilege adopted in some form in virtually every state of this country. (Yellin, *The History and Current Status of the Clergy-Penitent Privilege* (1983) 23 Santa Clara L.Rev. 95.) Justification for the privilege is grounded on societal interests in encouraging penitential communication and the development of religious institutions by securing the privacy of the penitential communication. (*Id.,* at pp. 113-114.) Counterbalanced against such weighty legitimate interests is the fundamental principle that " ' "the public . . . has a right to every man's evidence" ' " requiring strict construction of testimonial exclusionary rules and privileges tending to derogate the search for truth. (*Trammel* v. *United States* (1980) 445 U.S. 40, 50 [63 L.Ed.2d 186, 195, 100 S.Ct. 906]; *People* v. *Thompson, supra,* 133 Cal.App.3d at p. 428.)

Clearly, not every communication to a member of the clergy is privileged in the eyes of the law. (See, e.g., *People* v. *Johnson* (1969) 270 Cal.App.2d 204, 207 [75 Cal.Rptr. 605] [fleeing robber ran into nearby church requesting help from minister dressed in street clothes].)

■ In order for a statement to be privileged, it must satisfy all of the conceptual requirements of a penitential communication: 1) it must be

intended to be in confidence; 2) it must be made to a member of the clergy who in the course of his or her religious discipline or practice is authorized or accustomed to hear such communications; and 3) such member of the clergy has a duty under the discipline or tenets of the church, religious denomination or organization to keep such communications secret. (§ 1032; 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 39.1, pp. 1405-1407.) ■ And while there is a presumption of confidentiality whenever the statutory penitent's privilege is claimed (§ 917), the right to claim such privilege may be waived where the claimant freely discloses, or consents to disclosure of, "a significant part of the communication." (§ 912, subd. (a).)

At trial, defendant claimed her original conversation with Father Rankin was intended as a penitential communication. She testified that she sought out Father Rankin at the direction of Father Gompertz to whom she had initially confessed and asked forgiveness. Father Gompertz confirmed he had so directed defendant to whom he gave absolution, but he invoked the clergyman's privilege (§ 1034) and declined to testify as to the substance of their conversation. Father Rankin testified that he believed defendant's statements to him were in the nature of a secular request seeking counselling and not absolution; that when he offered to assist in her predicament requiring that the substance of their confidential discussion be divulged, defendant willingly agreed.

Ultimately, the trial court determined that Father Rankin's characterization of the conversation was more credible and that defendant's statements made in confidence did not "fall[s] within the area of the church law or the statute as far as the privilege is concerned."

Such judicial determination constituted an implicit finding that the conversation was not a penitential communication within the reach of the statutory privilege. ■ As with all factual determinations based upon conflicting evidence, the findings of the trial judge will be upheld on appeal if supported by substantial evidence; the judgment is presumed correct, and the evidence cannot be reweighed. (*People* v. *Ratliff* (1986) 41 Cal.3d 675, 686 [224 Cal.Rptr. 705, 715 P.2d 665]; *In re E.L.B.* (1985) 172 Cal.App.3d 780, 788 [218 Cal.Rptr. 429].)

■ Extensive testimony was given by church officials as to the discipline and tenets of the Episcopal Church. Floyd Frisch, attorney and chancellor of a neighboring diocese, testified for the defense that an Episcopalian priest is under an *absolute* duty to maintain the secrecy of the confession. He stated that the Episcopal Book of Common Prayer provides for this principle with the force of law; further, that in difficult cases, the benefit of the doubt should be given to the penitent.

In contrast, Reverend William Swing, Bishop of the California Diocese (which includes St. Stephen's Church), gave a different interpretation of Episcopalian church law. He testified that the rules are not as clear or as rigid as suggested and that each incident must be viewed on a case-by-case basis. In his opinion, as the church leader responsible for establishing liturgical practices for all churches within his diocese, the communication between Father Rankin and the defendant was not an "orecular [auricular] confession" but rather a request for pastoral counselling. He believed that the question whether a religious confession or a secular confidence was involved must be decided by each priest individually; that an assurance of confidentiality in a pastoral setting would be binding upon the priest in the absence of the penitent's change of mind permitting a "judgment call" by the former. After consulting with other church officials, he concluded that Father Rankin had not breached any religious duty. Bishop Swing was of the further opinion that since dual confessions were unusual and defendant had already confessed to Father Gompertz, her second communication to Father Rankin could not ordinarily be considered a true religious confession.

Father Rankin himself testified that he believed there was no church "law" which specifically dealt with the subject of confidential confessions. Though he acknowledged a moral obligation to keep a true confession under seal of secrecy, he did not believe that any church law governed his authority to determine whether the purpose of the conversation or communication was a request for religious or spiritual aid.

The expert witnesses agreed that the Episcopal Church recognizes the inviolability of an act of confession by a penitent seeking God's forgiveness and absolution through a priest. And both church experts and Father Rankin concurred that the aid of priests is frequently sought for the disparate purposes of religious confession and pastoral counselling. Father Rankin had no recollection of defendant's request to make a true "confession" seeking forgiveness or absolution, the very essence of the spiritual relationship privileged under the statute. (See *People* v. *Thompson, supra,* 133 Cal.App.3d at p. 427.)

However, Father Rankin had a clear recollection that defendant stated she needed his help in order that the bad checks would not bounce and thereby disclose her wrongdoing and inflict hurt in the process. He emphasized that the conversation did not even "remotely resemble" a religious confession; rather, that the mutual encounter involved a "problem-solving" entreaty under a promise of confidence from which defendant ultimately released him. Bishop Swing and other church officials he consulted

confirmed his belief that the situation involved no more than pastoral counseling which was not subject to the seal of a confession.

Since the trial court fully considered and evaluated all of the conflicting evidence in reaching its factual determination that the questioned statement was not a penitential communication within legal contemplation, no privilege attached preventing Father Rankin from otherwise consensually disclosing the content of the nonpenitential, though private, communication to the church officials and, ultimately, to the authorities. Where such determination is supported by substantial, credible evidence, as shown, we are duty bound to uphold it. (*People* v. *Ratliff, supra,* 41 Cal.3d at p. 686; *People* v. *Thompson, supra,* 133 Cal.App.3d at p. 427.)

In view of our dispositive determination, we need not discuss the remaining issues raised in the briefs.[6]

The order appealed from is affirmed.

Elkington, J., and Newsom, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 14, 1988.

---

[6] We do not subscribe to defendant's interpretation of the trial court's remark that she had "no choice" as the equivalent of a finding of nonwaiver. However, it is neither argued nor suggested by the record that defendant's consent to release Father Rankin from his assurance of confidence was the product of coercion.