*894
ON REMAND FROM THE SUPREME COURT OF LOUISIANA

|,MAX N. TOBIAS, JR., Judge.
The Supreme Court of Louisiana has remanded this matter to this court for briefing, argument, and opinion. State v. Gray, 03-2604 (La.1/9/04), 864 So.2d 128. This court has twice considered this matter: State v. Gray, 03-0779 (La.App. 4 Cir. 6/5/03), unpub., and State v. Gray, 03-1240 (La.App. 4 Cir. 8/14/03), unpub. The issue before the court is whether certain incriminating comments made by defendant Deonta Gray (“Deonta”) to Reverend Jeffrey Woolridge (“Woolridge”) are privileged under La. C.E. art. 511, Louisiana’s statutory version of the clergyman-penitent privilege.
La. C.E. art. 511 provides:
A.Definitions. As used in this Article:
(1) A “clergyman” is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.
(2) A communication is “confidential” if it is made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
B. General rule of privilege. A person has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.
C. Who may claim the privilege. The privilege may be claimed by the person or by his legal representative. The clergyman is presumed to have authority to claim the privilege on behalf of the person or deceased person.
|gOn 19 September 2002 the state filed a bill of information charging the defendant Deonta and defendant Jonta Gray (“Jon-ta”) with attempted second degree murder, a violation of La. R.S. 14:(27) 30.1. On 9 October 2002 the defendants entered pleas of not guilty. A hearing was held on 11 March 2003 and, on 28 March 2003, the trial court suppressed the statement made by Deonta to Woolridge.[1] The state noticed its intent to file an application for supervisory writs and the writ was timely filed on 28 April 2003. We reversed the trial court because, inter alia, Deonta had not asserted the privilege of La. C.E. art. *895 511. State v. Gray, 03-0779 (La.App. 4 Cir. 6/5/03), unpub. On remand, Deonta testified that he claimed the article 511 privilege. The trial court reversed itself, holding the statement by Woolridge was admissible. This court denied an application for supervisory writs on the basis that the trial court had not abused its discretion. State v. Gray, 03-1240 (La.App.8/14/03), unpub. From that 13decision, the Supreme Court granted the writ and remanded the matter to this court for further consideration. State v. Gray, 03-2604 (La.1/9/04), 864 So.2d 128.
At the 11 March 2003 hearing, Wool-ridge, the director for the Men’s Discipleship Program at the All Nations Ministry (the “church”) in Amite, Louisiana, testified that before his present position he was a member at the church. When asked how he had become a minister, Woolridge answered: “Coming through the program myself and attending church there and being discipled [sic] by the word of God into coming into ministry.” He further clarified that he became a minister through “[b]ible training and answering the call of God.” Woolridge stated that at the time of the hearing he had been a full-time minister for about one and one-half years. He took care of day-to-day matters of the church, set the agenda for each day, and taught classes in the morning and at night.
Woolridge said that he knew of Jonta and Deonta because Keyanta Gray (“Key-anta”)[2] was a member of the church involved in the women’s program for about six months, and she asked questions during classes. He stated that he was called on his cell phone by Keyanta to go to a motel room at the Colonial Inn in Amite to counsel the two defendants on a Saturday, “to talk to her boys about a matter and lead them to Christ.” Woolridge did not know the boys.[3] When Woolridge arrived at the motel, Keyanta and the defendants were present in a motel room. Keyanta told the two young men to tell “Brother Jeff’ (Woolridge)[4] 14what happened. Woolridge indicated that he had no idea what the conversation would entail, and he could not recall any mention of confidentiality. He stated that he understood that he was there to “lead them to Christ.” Woolridge said that he was not sure of the two youth’s names, however, the older, darker-skinned young man began to tell what had happened.[5]
According to Woolridge, the older, darker-skinned defendant, who did all the talking, said that “they were getting high, *896 called a cab driver to rob him, he came, he reached for a gun and he shot him.”. Wool-ridge said that the older, dark-skinned youth provided no details, and he did not ask. He said that he talked to the defendants about their lifestyle, the outcome of their way of living, and the game they were playing. The young man who had related the story seemed to be seriously interested in changing his life, and Wool-ridge prayed with him, asking for forgiveness. After being told about the shooting, Woolridge did not know what to do. He called his superior at the church, the pastor, who then spoke to Keyanta. She became very emotional. Then the pastor spoke to Woolridge again and instructed him to notify the authorities after leaving the Grays. Neither Deonta nor Jonta spoke to the pastor on the phone. Wool-ridge stated that he told Keyanta that she was to turn in the defendants because she wanted them to be saved. He did not tell her or the defendants that he himself was instructed to call the authorities. Wool-ridge stated that he did not say whether or not he intended to call the police and no one asked him not to call the police or not to relay the conversation. Woolridge, Keyanta, Deonta, and Jonta then prayed, and Woolridge 'told them to call him if anything came up. At that | Bpoint, defense counsel noted that the minister was using the name of Jonta, but the individual he identified was not Jonta. Woolridge said that he was in the motel room about thirty minutes and that during that time no one else entered or called the room.
When he left the motel room, Woolridge returned to his church and called the police as he was instructed. A day or two later, a New Orleans Police Department detective contacted Woolridge and drove to Amite the following week for a meeting. The officer recorded the statement, which Woolridge identified. He said that he had not been forced into giving a statement and that it was his decision to do so based upon his consultation with his leadership at the church. He further stated that he had never counseled the defendants prior to that day when he spoke to them in the motel room.
On cross-examination Woolridge confirmed that the second young man never said a word; only the older, darker-skinned one spoke. He decided to call the police only after talking to his elder. He reiterated that the call to the police was not based on Keyanta’s or the defendants’ decision that they wanted him to call the police. When asked if he advised Keyanta or the defendants that he would call the police from the motel, Woolridge answered: “I can’t say that I did.” Wool-ridge admitted that he did not ask Deon-ta’s, Jonta’s, or Keyanta’s permission to break- their trust and make the call. He stated that he had counseled people numerous times; however, he had never been told something of this magnitude. When asked about confidentiality and privacy, Woolridge conceded that he did not know what to do in the situation; therefore, he asked his superior, the pastor Eldolinus Sniff, for advice as to how to proceed. Woolridge said that he had gone to the motel room as a spiritual advisor and conceded that Keyanta 1 finever gave him any indication that she intended to leave the motel and turn over the defendants. The elder told Woolridge- that he had told Key-anta on the phone to turn over the defendants. Woolridge reiterated that he was licensed as a minister,-that the license was signed by the overseer in his denomination, and that he was a full-time minister.
From the foregoing evidence, the trial court suppressed the statement. Thereafter, this court reversed the trial court’s decision in State v. Gray, 08-0779 (La.App. 4 Cir. 6/5/03), unpub. We held that no dispute existed as to whether Woolridge *897 was a minister to whom privileged communications could be made. We noted the lack of prior affiliation between Jonta, Deonta, and Woolridge’s church and that the record was devoid of evidence that Keyanta was present for purposes of her own repentance; that is, by implication Keyanta was present because she, as a relative of Jonta and Deonta, wanted to see the defendants obtain counseling to “lead them to Christ.” We noted that neither Jonta nor Deonta testified that they regarded the communication as that of a penitent. We also held that a qualified privilege existed between Woolridge and pastor Sniff, and that their communication about the defendants did not waive the privilege. Additionally, in reversing the trial court and remanding for further proceedings, we held that in the absence of testimony from Deonta asserting the privilege, especially in light of Woolridge’s admission that he neither told Keyanta, Jon-ta, or Deonta that he intended to call the authorities nor hold the communications as confidential, given the totality of the facts, the trial court erred in granting the defendants’ motion.
At the 19 June 2003 hearing on the remand, only Deonta testified. He testified that he went to see a minister with his Aunt Keyanta and his cousin, Jonta. The purpose was “[t]o speak with a priest and for spiritual guidance.” He had never spoken to a priest or minister before that day. When asked if he | intended to go to or to talk to the police, Deonta answered negatively. When asked if he had any intention that what he told the minister in seeking spiritual guidance was to be told to anyone else, Deonta answered: “No, sir.” He answered negatively when asked if he thought that the minister was going to tell the police. Deonta was then asked: “Would you have said anything to him [the minister] if you thought he was going to turn around and tell the police?” He answered: “No, sir.”[6] Defense counsel then asked: “Were the words spoken to the minister for his ears only?” Deonta answered: “Yes, sir.” He answered affirmatively when asked if his aunt took him to the minister. When asked whether his Aunt Keyanta told him that after his conversation with the minister, the minister was going to call the police and tell the officers what had been said, Deonta answered negatively. When asked if his aunt told him that the minister would tell no one else, Deonta answered: “No, sir.”
On cross-examination Deonta said that he was the one to talk to the minister that day. He admitted that his aunt and his cousin were also present. He answered affirmatively when asked if he made the “statements in front of everyone else that was in the room.... ” Again Deonta answered negatively when asked if his aunt told him that what he said “would stay with the reverend.” He admitted that the minister made a phone call from the room, but Deonta claimed that he did not know who was on the other end of the phone and did not listen to the conversation. He denied being aware of any sort of proceeding like confession in the Catholic Church. He admitted that he did not go to church, and he did not personally know Woolridge; his aunt knew Woolridge. He again denied having any idea that Woolridge would speak to somebody else about the 18matter. When asked if he asked the minister if he was going to speak to someone else about what was said there, Deonta answered: “No, sir. I thought I shouldn’t have to.” He claimed that he did not ask to whom *898 the minister was calling or whether the minister intended to talk about what he had told him. Deonta answered negatively when asked if he expressed any concerns to anyone in the room about the minister making a phone call.
Contrary to what the trial court had initially ruled, the court held:
The Court heard the testimony that there were two other people present in the room during the time these activities were taking place; that at least one phone call was made to an unidentified person dealing with an unspecified matter. The witness testified that he was not aware of the nature of the conversation that was going on. The Court did not hear any testimony as to the defendant’s familiarity with this particular minister. His testimony was he didn’t attend church; there was no previous contact with clergy on matters of confidence. And the Court heard no testimony that would re-enforce the notion that the defendant had any expectations of privacy or, if you will, privilege, when he approached this particular minister.
The defendants then sought supervisory writs. This court denied the application finding that the trial court did not abuse its vast discretion. State v. Gray, 08-1240 (La.App. 4 Cir. 8/14/03), unpub. On review, the Supreme Court remanded the matter to this court for briefing, argument, and opinion. State v. Gray, 03-2604 (La.1/9/04), 864 So.2d 128.
Defense counsel argues that the trial court abused its discretion by denying the motion to suppress after Deonta testified about his intent. Counsel claims that the presence of a third party is not an absolute bar to confidentiality, but only an indication as to whether the person invoking the privilege intended the statements to be confidential. Defense counsel relies on State v. Ellis, 99-0425 (La.App. 1 Cir. 12/28/99), 756 So.2d 418, writ denied, 2000-0762 (La.11/27/02), 831 So.2dJ.2268, the only published case to consider La. C.E. art. 511.[7] In Ellis, a case involving an aggravated assault, the First Circuit held a statement of the defendant to a minister was privileged in spite of the presence of the victim and the defendant’s and victim’s wives. The court reasoned that the minister was acting in a spiritual capacity where both the victim and the defendant were present, the meeting occurred in the minister’s office at the church, and the minister was attempting to counsel the couples and reconcile their differences. Even though the court found the statement was privileged, the court held the admission of the statement was harmless error because of other overwhelming evidence against the defendant. Defense counsel notes that the other two people present in the motel room were Deonta’s mother and brother,[8] not the victim or the victim’s family members. Defense counsel argues that after the first hearing, the trial court was willing to accept the circumstantial evidence that Deonta had gone to Woolridge for spiritual guidance and expected his communication to be confidential, but then changed its mind after Deonta testified that he expected his statements to remain confidential. Counsel points to errors by the court in focusing on whether Deonta had a personal relationship with Woolridge and whether the minister was sworn to confidentiality-
The state argues that the two-fold question was whether a privilege was violated when Woolridge called the police, and *899 whether the privilege was waived when there were third parties present for the communication. Citing State v. Aucoin, 362 So.2d 503 (La.1978),[9] the state notes the four general conditions to establish any privilege: (1) the person making the communication intended it to be confidential; (2) the element of confidentiality must be essential to the relationship between the parties; (3) the relationship must be one which society linwishes to encourage; and (4) the injury to the relationship that would result from the disclosure would be greater than the benefit gained by giving the trier of fact access to the truth. The state also argues that Keyanta and Jonta were present in the room when Deonta spoke to Woolridge, therefore, it was not intended to be confidential. Woolridge called his supervisor and told him about Deonta’s story; therefore, others were involved in this communication, and Wool-ridge was not told not to tell anyone. The presence of third parties, the state asserts, negated the presumption of confidentiality.
After the first hearing where Deonta did not testify and Woolridge did not assert the clergyman-penitent privilege, the trial court concluded that Deonta approached the minister with his mother and brother (aunt and cousin) for the purpose of spiritual guidance. The court concluded that it was “not convinced that the presence of either the mother or the brother in any way diminished the sanctity or the applicability of the privilege within the facts of this particular case.”
At the re-opened hearing, Deonta testified that he went with his aunt and his cousin to see a minister for the first time. Deonta said that the purpose was “[t]o speak with a priest and for spiritual guidance.” Deonta made it clear that he communicated with the minister “in his professional character as spiritual adviser.”[10] Woolridge clearly testified that Deonta was sincere and repentant; the minister prayed with Deonta. Although Deonta’s testimony consisted primarily of answering questions with a “yes” or “no,” he did state that he thought he did not have to ask a minister if he would keep a statement confidential.
Following Deonta’s testimony, the trial court decided to deny the motion to suppress after Deonta testified. The court appeared to focus on the fact that (1) two luthird parties were present during the statement, (2) Deonta failed to attend church previously or have contact with clergy on matters of confidence, (3) Deonta lacked a personal relationship with Wool-ridge, and (4) Deonta was not aware of the nature of the minister’s telephone call to his superior. The trial court concluded that there had been no testimony to reinforce the notion that Deonta had any expectations of privacy when he approached that particular minister.
As La. C.E. art. 511(A)(2) provides: “A communication is ‘confidential’ if it is made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.” The Official Comments to article 511 provide in pertinent part:
[[Image here]]
(c) Unlike former provisions in Louisiana law as to availability of this privilege in criminal cases (former R.S. 15:477) and civil cases (former R.S. 13:3734.1), this Article does not by its terms extend the privilege to “information that the clergyman may have gotten by reason of such communication.”
*900 (d) Unlike former R.S. 15:477 and former R.S. 13:3784.1, this Article does not by its terms require the express consent of the communicant before the clergyman testifies to the communication. The clergyman is, however, expressly authorized to claim the privilege on behalf of the communicant.
* * *
(h) Defining “confidential” to include communications made in the presence of “other persons present in furtherance of the purpose of the communication” makes it clear that under appropriate circumstances the privilege may extend to revelations made in the presence of each other by a husband and wife who together seek marital counseling, and similar joint consultations. See 2 J. Weinstein & M. Berger, Weinstein’s Evidence, S 506[02] at 506-8 (1985).
(i) Under. this Article the privilege clearly belongs to the communicant. The provisions of former R.S. 13:3734.1 were not clear on this subject. Under that section a clergyman perhaps could have testified in a civil case to a privileged communication over a claimer [sic] of privilege by the communicant.
In State v. Mayer, 589 So.2d 1145 (La.App. 5 Cir.1991), the Fifth Circuit was faced with a trial court’s decision to allow the testimony of two ordained ministers to whom the defendant had spoken. At issue was the predecessor to La. |1?C.E, art. 511, former La. R.S. 15:477, which provided: “No clergyman is permitted, without the consent of the person making the communication, to disclose any communication made to him in confidence by one seeking his spiritual advice or consolation, or any information that he may have gotten by reason of such communication.” The defendant had gone to one minister’s house and stated that he had shot his wife. The minister was the defendant’s best friend, and he said that the defendant told him as a friend, not a confessor. The minister, who did not believe that the defendant was seeking forgiveness or spiritual counsel, told his wife. A second minister, who knew the defendant and his wife, called the defendant to verify a story circulating that the defendant had killed her. The defendant had not sought spiritual guidance or counsel; he was not a member of that minister’s congregation. The Fifth Circuit discussed three previous cases • and made its conclusions:
In State v. Welch, 448 So.2d 705 (La.App. 1st Cir.1984), writ denied, 450 So.2d 952 (La.1984), the privilege was not allowed because the minister to whom the statement was made was not a “clergyman” within the meaning of the statute.
In State v. Hereford, 518 So.2d 515 (La.App. 3rd Cir.1987), it was also decided that the witness did “not appear to merit the respected professional designation” of clergyman. Furthermore, the testimony did not indicate that witness was approached for spiritual counseling.
In State v. Berry, 324 So.2d 822 (La.1975), cert. den., 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976), the defendant, convicted of murder, objected to the introduction of the minister’s testimony arguing that such testimony would violate the clergyman-penitent privilege. In Berry, on the evening of the murder, defendant went to the apartment of a sister of a minister. Present at the time were the minister, the minister’s sister and a friend. The evidence showed that defendant went to the apartment to pawn a watch. After the minister’s sister refused to loan him the money, he asked to speak to l13the minister. Defendant then told the minister that he had gotten the watch from a girl he had *901 killed and needed $8.00 or else he might hurt someone else. The minister loaned him $8.00, took the watch and subsequently turned it over to police. After listening to this evidence outside the presence of the jury, the court determined that the privilege did not apply. In upholding the decision of the trial court, the Louisiana Supreme Court stated:
We are unable to find error in the trial court’s factual appreciation that the primary purpose of this visit was not to seek spiritual advice or consolation, nor in its finding that, in the totality of circumstances presented (including that the communication was made in the presence of two other persons), the communication was not made within the requisite nature of a confidential disclosure for religious purposes of a penitent to a clergyman seeking religious consolation. 8 Wig-more on Evidence, Section 2396 (McNaughton Rev.1961).
State v. Berry, supra at p. 829.
In the instant case, the clergyman-penitent privilege is inapplicable. The totality of the circumstances presented does not indicate that statements made by the defendant are within the communications protected. Neither the clergyman nor the defendant considered the statements to be in the nature of a confidential disclosure by a man to his spiritual advisor for purposes of gaining religious guidance. In fact, the defendant himself denies that any statements were made for any reason. Thus, the trial judge properly allowed the testimony of these two witnesses. This assignment is without merit.
Id. at 1148.
In State v. Tart, 93-0772, pp. 23-25 (La.2/9/96), 672 So.2d 116, 143, the Supreme Court upheld a trial court’s decision that the statements made by the defendant to a minister were not protected by the clergyman-penitent privilege found in former La. R.S. 15:477 and were properly admitted against him. According to the minister’s testimony, he visited the defendant at the request of | ucommunity members who were concerned about the treatment of prisoners in jail. The minister was the local president of the N.A.A.C.P. and asked the police chief to speak to the defendant about his treatment and any possible civil rights violations. The minister was accompanied by the defendant’s father when he visited the prison. At trial the minister testified to what the defendant had confessed. Relying on State v. Berry, supra, which rejected the clergyman-penitent privilege if the clergy member merely happened to be present during a suspect’s admission or was not at hand to offer spiritual succor, the Supreme Court concluded that the record showed the minister’s main purpose in visiting the defendant was to question him as to whether his civil rights were violated. The defendant was not a member of the minister’s congregation, and the minister had never met the defendant before and did not visit at the defendant’s request. The minister was acting on behalf of the N.A.A.C.P. when he visited the defendant, not as a pastor. The Supreme Court upheld the decision to allow the minister’s testimony relating to the defendant’s communication.
In preparing this opinion, we have reviewed several law review articles, treatises, and other publications.[11] Among the more useful (because they address an overview of the national perspective on the issue) are Clergy Privilege, 93 ALR 5th *902 327 (2001) and Wright & Miller, Federal Practice and Procedure (1992). We quote Wright & Graham, 26 Federal Practice and Procedure § 5616 (1992), in pertinent part:
Since the penitent is the holder of the privilege and the person supposed to be encouraged to communicate under the instrumental rationale, it is clear that the intent of the penitent is the controlling factor in confidentiality. The fact that religions differ in whether orj^not they require penitential communications to be confidential and imposing duties of confidentiality on their clerics may be relevant to prove the intent of the penitent, they are not controlling; the penitent may desire confidentiality and reasonably expect the cleric to honor it even though it is not required by church doctrine.
One indicia of an absence of intent to make a confidential communication is where the communication itself discloses an intent that its content be revealed to others, or where the circumstances show that the penitent expects or intends disclosure, or where the contents of the communication are shown to have been intended to be transmitted to a third person. The cases rather uniformly refuse to allow the privilege to be used to prevent disclosure in court where it can be shown that the communication was intended to be disclosed to others out of court. The rationale is that this disclosure involves no betrayal of the penitent by the cleric and that the purpose of the privilege is not to encourage the use of the cleric as a privileged intermediary between the penitent and others. Thus, it has been held that there is not the requisite confidentiality when the cleric is asked to negotiate a plea for the defendant, to communicate information to the police or to the defendant’s ex-spouse, or lawyer, or the cleric is made an innocent dupe in conveying instructions to a jailed defendant’s co-conspirators. A lack of confidentiality can be “implied” from “circumstances where confidentiality cannot be expected.” For example, a murder suspect confronted by the cleric-father of his victim cannot reasonably expect that the cleric will keep confidential what the suspect says. It has also been said that confidentiality cannot be expected “in public facilities or large groups”; e.g., when the penitent addresses the cleric on the steps of the church following worship in the presence of other members of the congregation. But this circumstance needs to be considered with care; for example, the nature of the confessional and the acoustics in some churches makes it fairly easy for those waiting in line to make their confession to hear the words of those already in the confessional. Nonetheless, Roman Catholics, at least, would regard such a confession as confidential because of the obligation under canon law “to preserve the secret” that is imposed on “all others to whom knowledge of sins from confession shall come in any way.”
[[Image here]]
Confidentiality can be found to be lacking where there is an express statement to this effect, but a statement to the cleric or others that the penitent does not expect the cleric to endure contempt or imprisonment is not such a statement. It is frequently said that the presence of third persons is a circumstance that destroys confidentiality, though writers have sometimes suggested otherwise. However, these positions may be reconciled on the basis of differing views of the concept of “presence”; for example, when courts hold that there is no confidentiality for statements *903 made in the presence of a police officer, but there is when the officer listens in on a confession; this can be explained on the basis of a special notion of |1(ipresence — that is, that the third person must be “in on the conversation” rather than simply eavesdropping. It has been sometimes suggested that a rigid application of the third person rule would bar dual confessions; e.g., where a husband and wife both consult the cleric about common marital problems .... [I]t might be better said that it is the “presence of extraneous, non-clergy, third parties” that destroys confidentiality. Thus, a confession in the presence of the penitent’s employer is not confidential because the presence of the latter is extraneous to the purpose of the communication. On the other hand, where an incarcerated person has no choice but to make a confession in the presence of a prison guard, this should be confidential if the prisoner can show that the authorities would not allow him to speak to the confessor in the absence of a guard.
Some states recognize a presumption of confidentiality upon proof of the other elements of the privilege. However, it is not clear that federal courts will recognize such a presumption.
[Footnotes omitted]
The state conceded that Woolridge was a clergyman under La. C.E. art. 511. Woolridge testified that no one told him that the conversation was confidential, and he did not so consider it; however, the trial court must have reasoned that the penitent defendant justifiably believed that his statement to a minister serving as a confessor during a spiritual counseling session would be considered confidential and privileged communication even if not required by the church or religion involved.
According to Woolridge, Deonta was serious about repenting that day in the motel room. The minister admitted that he never told Keyanta, Deonta, or Jonta that he intended to call the police or not hold the communication as confidential. Woolridge’s meeting with Deonta, which was aimed only at Deonta’s repentance and salvation, was private and confidential by implication, if not by an express statement by the parties. The communication by Woolridge to another minister or elder of the church does not destroy the confidentiality of the confession for Woolridge was seeking information as to how to proceed from a person also 1^interested in the same aims of Woolridge. The privilege was not waived by the presence of and disclosure to third parties.[12] Deonta and Jonta were present in the motel room when Deonta told the minister what happened. However, Woolridge was there as a minister only because Deonta’s aunt had called her church. All persons testifying agree that the statement was made by Deonta for penitential purposes, although it occurred at the urging of Keyanta, who appears to be a person of significant personal influence in Deonta’s life.
We do not find that State v. Ellis, supra, helps us resolve the present case for the following reasons. First, we agree with the view expressed by the authors in Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law 2003 at 424, that the presence of the victim during the defendant’s confession should destroy the privilege. Second, the Ellis holding that the communication was privileged, but its admission was harmless, was based on a fact *904 intensive analysis. Therefore, we do not read Ellis as applying to the facts of the instant case or as expressing a rule of general applicability.
We understand that La. C.E. art. 511 cannot be read or applied in a vacuum. We hold that material factors to be considered when determining whether the privilege applies are, among others, (1) whether the communication to the clergyman is motivated by spiritual or penitential considerations; [13] (2) whether the communication is made to the clergyman in his or her professional capacity;[14] (3) whether communicant believes his/her acts or thoughts to be flawed, coupled with |iaa desire to receive pastoral consolation and guidance[15] (vis-a-vis, in the appropriate case, the public’s right to hear all evidence in the search for truth);[16] (4) whether the communication is intended by the communicant to be confidential;[17] (5) whether the acts or thoughts of the communicant are enjoined by the church denomination, religious group, or sect;[18] and (6) whether the church denomination, religious group, or sect imposes a duty upon the clergyman to keep the communication secret.[19] In addition, we find that the communicant may be a first time communicant if he or she reasonably believes, based upon the communicant’s knowledge, that the communication will be held confidential and is motivated by penitential considerations. Similarly, one should not view the communication from a christocentrie point of view; the tenets of the religion of both the communicant and clergyman must be considered.
This is a close case. However, the defendant’s aunt and co-defendant were “other persons present in furtherance of the purpose of the communication.” La. C.E. art. 511(A)(2). The trial court, which was not convinced that their presence “diminished the sanctity or the applicability of the privilege within the facts of this particular case,” was not clearly wrong or manifestly in error when it originally held the statement should be suppressed. If the trial court, following the second hearing, had stated that it did not find Deonta’s credible — that he intended that the ^j^statement be confidential and not disclosed or that Deonta did not make the statement for spiritual or penitential considerations but rather to merely appease his Aunt Deonta — then we would find no abuse of the trial court’s discretion. If the trial court had heard Deonta’s testimony at the original hearing, this court would have denied the writ. However, in the *905 absence of such a finding by the trial court, we are required to uphold the plain, precise language contained in La. C.E. art. 511, and more specifically, the definition of confidential communication in La. C.E. art. 511(A)(2). We have no evidence that would indicate that the statement was not made for spiritual purposes.
We are bound to follow the precise language of article 511. The legislature is the appropriate body to change the law.
Accordingly, we reverse the judgment of the trial court and suppress the statement of Woolridge. We remand this matter to the trial court for further proceedings.
WRIT GRANTED; REVERSED AND REMANDED.

. The trial court concluded:
I think the record was clear that when the defendant Mr. Gray approached, along with his mother and brother, this minister, it was as a confessor and it was indeed for the purpose of spiritual guidance.
The Court is also satisfied that the person approached, the minister, was indeed a clergyman within the purview of Article 511 of the Louisiana Code of Evidence, which defines a clergyman as a minister, priest, rabbi or other functionary of a religious organization or an individual reasonably believed so to be by the person consulting him. The Court believes that the record was clear that Mr. Gray, his brother and mother approached the minister under those circumstances believing him, in fact, to be a minister and therefore finds that the privilege pertained as to communications directed to the minister within the course of that contact.
As to whether the privilege was violated, it can be violated as the result of the subsequent communication by the minister. The Court would note, as has already been pointed out by the State, that there were two other parties, the mother of the defendant and the brother, the co-defendant, at the time the communication was made.
The Court is not convinced that the presence of either the mother or the brother in any way diminished the sanctity or the applicability of the privilege within the facts of this particular case. Therefore, the Court at this time will order that the communication to the minister by the defendant [sic] Mr. Gray [sic] be suppressed.

. In the 19 June 2003 transcript, the Keyan-ta's name is spelled "Keyona.” In the 11 March 2003 transcript, it was spelled phonetically as "Kenyatta,” and the state used "Key-anta''; in this opinion, we will use Keyanta for the sake of consistency.

. In the original hearing transcript it appears that Deonta and Jonta are Keyanta's sons; however, in Woolridge’s statement, he said that Keyanta called him to counsel her son and her nephew. In the hearing transcript there are references to Keyanta as the defendants’ mother and questions about whether she intended to turn in her children. We have subsequently concluded from the record as a whole that Jonta is Keyanta’s son and Deonta is Keyanta’s nephew.

. The Grays referred to Woolridge as Brother Jeff.

. Woolridge identified the defendant sitting closer to him in the jury box as the individual who spoke. (As explained infra, that individual was Deonta.) When the court asked that it be noted for the record the defendant identified, defense counsel stated: "The state doesn’t know who’s here? I’m not going to identify anybody. That could be a problem in this case, who’s who.” The trial judge questioned the minister, who stated that he was "referring to the darker complected [sic], I believe his name is Jonta.”

. Although there was an objection lodged at this point in the hearing, Deonta answered before the trial court ruled. Because the line of questioning was being allowed, the court did not strike the answer.

. La. C.E. art. 511 replaced La. R.S. 15:477, the prior law setting forth the clergyman-penitent privilege.

. Actually, respectively, aunt and cousin.

. Aucoin involved an issue relating to the physician-patient privilege.

. See La. C.E. art. 511(B).

. We note that currently the concerns 6f the writers addressing the clergyman-penitent privilege are directed to issues of child abuse and terrorism.

. That is, "present in furtherance of the purpose of the communication.” La. C.E. art. 511(A)(2).

. Commonwealth v. Stewart, 547 Pa. 277, 690 A.2d 195 (1997); People v, Johnson, 270 Cal.App.2d 204, 75 Cal.Rptr. 605 (2d Dist.1969); Kos v. State, 15 S.W.3d 633 (Tex.App.Dallas 2000).

. State v. Berry, 324 So.2d 822 (La.1975); Tankersley v. State, 724 So.2d 557 (Ala.Cr.App.1998); State v. Richmond, 590 N.W.2d 33 (Iowa 1999); State v. Cary, 331 N.J.Super. 236, 751 A.2d 620 (App.Div.2000).

. State v. Orfi, 511 N.W.2d 464 (Minn.Ct.App.1994).

. Clergy Privilege, 93 ALR 5th 327, 350 (2001) (Justification for the clergyman-penitent privilege is based in society's interest in encouraging the development of religious institutions by securing the privacy of penitential communications).

. State v. Berry, 324 So.2d 822 (La.1975); State v. Mayer, 589 So.2d 1145 (La.App. 5 Cir.1991); Bonds v. State, 310 Ark. 541, 837 S.W.2d 881 (1992); Plate v. State, 925 P.2d 1057 (Alaska Ct.App.1996).

. Blough v. Food Lion, Inc., 4 F.3d 984, 1993 WL 321797 (4th Cir.1993); State v. MacKinnon, 1998 MT 78, 288 Mont. 329, 957 P.2d 23 (1998); State v. Potter, 197 W.Va. 734, 478 S.E.2d 742 (1996).

. People v. Edwards, 203 Cal.App.3d 1358, 248 Cal.Rptr. 53 (1st Dist.1988).